963 P.2d 1135

**CHILD SUPPORT ENFORCEMENT AGENCY, STATE OF HAWAIʻI,**
Petitioner–Appellee,

v.

**John DOE, Defendant–Appellant,**

and

**Jane Roe and John Roe, Defendants.**

No. 20782.

Intermediate Court of Appeals of Hawaiʻi.

Aug. 13, 1998.

Kenneth H. Nakamura, on the briefs, Kaneohe, for defendant-appellant.

Amy Murakami, Deputy Corporation Counsel, City and County of Honolulu, on the brief, for petitioner-appellee.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

We hold that, pursuant to Hawaiʻi Revised Statutes (HRS) chapter 576D (1993), relating to child support enforcement, Petitioner–Appellee Child Support Enforcement Agency (CSEA) may bring an action to establish the paternity of a child when the child's custodial parent has applied to CSEA for assistance in obtaining an order of support for the child, and when a paternity action is necessary for CSEA to obtain such an order. HRS §§ 576D–3(b)(3) (Supp.1997) and –4 (1993). We further hold that the phrase "born out of wedlock," as used in HRS § 576D–3(b), refers to a child "whose parents are not, and have not been, married to each other regardless of marital status of either parent with respect to another." *Black's Law Dictionary* 184 (6th ed.1990). Accordingly, we conclude that CSEA properly commenced a paternity action alleging that Defendant–Appellant John Doe (Appellant) was the natural father of the male child (Child) born on June 14, 1996 to Defendant Jane Roe (Mother) while she was married to Defendant John Roe (Roe).

As a related point, under HRS chapter 584 (1993), Hawaiʻi's version of the Uniform Parentage Act (UPA), 9B U.L.A. 287 (1973), we hold that no presumption of paternity set forth in HRS § 584–4 (Supp.1996) must be rebutted before evidence of another presumption may be introduced. Hence, CSEA was not required to rebut the presumption of paternity implicating Roe, set forth in HRS § 584–4(a)(1), before proceeding with the paternity action against Appellant, who was the presumed father under HRS § 584–4(a)(5). We affirm the findings of the family court of the first circuit (the family court) that the presumption pointing to Roe was rebutted by

clear and convincing evidence, while the presumption pointing to Appellant was not.

In a paternity action, HRS §§ 584–10 and –13 mandate that an informal, pre-trial hearing be held by the court to evaluate the likelihood of establishing at trial the alleged father as the natural father, to determine whether declaring paternity would be in the best interest of the child, and to recommend a settlement to the parties. Such a hearing is not required before a court may order genetic testing of the parties. Although not formally designated as such, we believe that pre-trial hearings held herein satisfied the statutory requirements of HRS §§ 584–10 and –13.

Additionally, in our view, there is no statutory requirement under HRS § 584–9 that the child must be made a party to or that a guardian ad litem must be appointed to represent the child's interests in a paternity action. HRS § 584–9 leaves these decisions to the discretion of the court, and under the facts in this case the family court did not err in not joining Child or appointing a guardian ad litem for Child.

Finally, we conclude that the family court did not deprive Appellant of due process by its actions at the April 3, 1997 trial-setting conference, or by any statements or actions allegedly demonstrating judicial bias against Appellant.

We therefore affirm the family court's May 28, 1997 judgment that Appellant is Child's natural father; the May 28, 1997 findings of fact, conclusions of law, and order denying Appellant's motion to disqualify Judge Darryl Y.C. Choy (Judge Choy) (findings, conclusions, and order denying Appellant's motion to disqualify Judge Choy); the May 28, 1997 findings of fact, conclusions of law, and order denying Appellant's motion to dismiss the petition (findings, conclusions, and order denying Appellant's motion to dismiss the peti-

tion); and the May 22, 1997 oral order granting CSEA's motion for attorneys' fees.

## I.

### A.

On June 14, 1996, Mother gave birth to Child. During the time period when Child was conceived and born, Mother was married to Roe.

At some point thereafter, Mother applied for services from CSEA.[1]

On September 25, 1996, CSEA filed a petition for paternity (the petition) pursuant to HRS chapters 576D and 584, alleging Appellant to be Child's natural father. HRS chapter 576D sets forth CSEA's statutory authority and duties. HRS chapter 584 is patterned on the UPA adopted in 1973 by the National Conference of Commissioners on Uniform State Laws.[2] Hse. Stand. Com. Rep. No. 136, in 1975 House Journal, at 980; UPA Historical note, 9B U.L.A. at 287.

The petition alleged, *inter alia,* that Mother and Roe were separated but still married, Roe was the presumed but not the natural father of Child, and Appellant was the natural father of Child. Further, the petition implied that Mother was "a recipient of State assistance"[3] and requested Appellant to pay support and other expenses for Child. In conjunction with the requests, the petition sought adjudication of Appellant as the natural father of Child.

On October 2, 1996, Mother filed an appearance and acknowledgment of service with the family court, agreeing to "cooperate with [CSEA] as requested to establish child support for and/or the paternity ... of [Child.]"

On October 4, 1996, Roe filed an appearance and waiver of his presence at all further hearings, stating he was not the natural father of Child:

---

1. The record does not indicate the date on which Defendant Jane Roe (Mother) applied for services from Petitioner–Appellee Child Support Enforcement Agency (CSEA).

2. The purpose of Hawai'i's version of the Uniform Parentage Act (UPA), 9B U.L.A. 287 (1973), is "to provide substantive legal equality for all

children regardless of the marital status of their parents." Hse. Stand. Com. Rep. No. 136, in 1975 House Journal, at 980.

3. At trial, Mother testified that she had never received any cash assistance from the State of Hawai'i.

I was married to [Mother] on December 23, 1982, and still am married to her, but was physically separated from her during the conception period for [Child] and have had no sexual relations with her since the time of separation. Pursuant to HRS Section 584-4[ (a) ](1) and Section 584-9, I am the legal, presumed father of [Child], born on *June 14, 1996.* However, I am not the natural father of said child.

(Emphasis in original.)

On October 10, 1996, Appellant was served with the petition. The attached summons required Appellant to appear and answer the petition on October 25, 1996.

On October 30, 1996, the family court entered a written, stipulated order regarding the genetic testing of Mother, Child, and Appellant. The order indicated that on October 25, 1996, the parties stipulated to such an order without a court hearing.[4] Mother, Appellant, and counsel for CSEA signed this order. The order noted that Appellant had been "previously tested in another matter" and directed that the prior sample be used if it was still "valid."

On December 24, 1996, the genetic test results were filed with the family court. According to the paternity evaluation report, the samples from Mother and Child were taken on October 25, 1996, and Appellant's sample was taken on May 3, 1996. This report indicated that the "Probability of Paternity" for Appellant was 99.84% and that the "Combined Paternity Index" was 643 to 1.

On February 7, 1997, Appellant, through his attorney,[5] filed a motion for a new genetic test, arguing, *inter alia*, that he did not give permission to use his sample from the prior matter, and that there may have been "a mistake or mix-up of samples."[6]

On February 20, 1997, the family court orally granted Appellant's motion for a new

genetic test and ordered that the genetic test be scheduled by Appellant no later than the end of March 1997. The family court did, however, order Appellant to pay child support, but suspended such payments pending the outcome of the genetic test. The pretrial hearing regarding the results of the new genetic test was scheduled for June 5, 1997.

On March 6, 1997, Appellant filed an answer to the petition, denying that he was the natural father of Child and demanding a jury trial.

On March 14, 1997, CSEA filed a motion to strike Appellant's answer as untimely. A hearing on the motion was set for April 3, 1997.

On March 18, 1997, Appellant filed an amended answer, again denying paternity but deleting his demand for a jury trial.

On April 3, 1997, at a recorded hearing on CSEA's motion to strike his answer, Appellant admitted that he had not scheduled the second genetic test which was to have been scheduled by the end of March. When CSEA suggested that a trial date be set, Appellant stated that he wanted a trial. The family court informed the parties that they would have to meet with Judge Choy to set a trial date, and no one objected.

On the same day, after the recorded hearing, the parties met with Judge Choy in an off-the-record conference to discuss a possible trial date. In his opening brief, Appellant makes several assertions about what occurred at this unrecorded conference:

> Over the objections of [Appellant's] counsel, Judge Choy ordered that trial be held on May 5, 1997 despite a Pre-Trial Hearing scheduled for June 5, 1997. In addition, ... Judge Choy also ordered that [Appellant] was [sic] denied any further discovery and ordered that [Appellant] overcome the presumption that he was now the presumed father under HRS

---

4. The parties' oral stipulation to this order on October 25, 1996 was off the record.

5. In his opening brief, Defendant–Appellant John Doe (Appellant) states that he was "not represented by legal counsel in this action prior to late January, 1997."

6. On appeal, Appellant does not appear to raise any challenges to the validity of the genetic test results filed with the family court on December 24, 1996. Instead, Appellant acknowledges that these results raised the Hawai'i Revised Statutes (HRS) § 584-4(a)(5) (Supp.1996) presumption indicating that he is Child's natural father.

§ 584–4. [The family court] also made a substantive ruling of law that [Appellant] had the burden to overcome the statutory presumption of paternity under HRS § 584–4.

### B.

On April 16, 1997, Appellant filed a motion to dismiss the petition. Appellant argued, *inter alia,* that (1) CSEA did not have standing to bring the petition; (2) the petition failed to name an indispensable party; [7] (3) the family court erred in not appointing a guardian ad litem for Child; and (4) CSEA, Mother, and Roe were in "illegal collusion" prejudicial to Appellant.

On April 23, 1997, CSEA filed a memorandum in opposition to Appellant's motion to dismiss. CSEA responded that (1) Mother had "applied to [CSEA] for its services in establishing paternity for [Child]" and, thus, CSEA had standing to bring the petition pursuant to HRS § 584–6 and HRS §§ 576D–3 and –4; (2) there was no collusion simply because CSEA, Mother, and Roe all took the position that Appellant was the natural father of Child; (3) CSEA never undertook to represent Roe in the action; and (4) Appellant had not shown good cause for terminating the paternity action.

On April 24, 1997, the family court heard Appellant's motion to dismiss. At the hearing, Appellant also argued that the stipulation to the genetic test should be set aside because Appellant did not have an attorney at the time he signed the stipulation. The family court orally ruled:

First of all, regarding the issue of standing[, the family court] believes standing is statutory in this case pursuant to [HRS § ] 584–6.

As to the question of collusion[, t]here has been a statement that there is collusion between CSEA and [Mother].

Clearly what the caption reads in this case, CSEA, by their statutory standing[,] has brought an action against the biological mother of [Child], [Mother;] [Appellant], the alleged biological father[;] and

[Roe,] who is the presumed father in this case.

There are three defendants. Although two of the defendants have not disagreed with the position of [CSEA, the family court] does not believe that the agreement arises [sic] to the level of collusion.

Further, I believe this is a matter of law that [Child] is not [an] indispensable party.

Further[,] regarding [the] genetic test which has been performed and submitted as evidence in this case. [Appellant] is not subject to be Mirandized prior to the granting of the request for [a] genetic test.

Even if this was an issue it appears that [Appellant] was aware of his rights to legal [c]ounsel.

For this reason [the family court] does not believe that this Motion should be granted in this case.

On May 2, 1997, the family court entered a written order based on the April 3, 1997 hearing, ordering pre-trial motions to be filed by April 21, pre-trial motions to be heard on April 28, and trial to be held on May 5, 1997. The order "set aside" the pre-trial hearing date of June 5, 1997.

### C.

On May 5, 1997, Appellant filed a motion to disqualify Judge Choy. Among other matters, Appellant claimed that Judge Choy demonstrated bias and partiality at the February 20, 1997 pre-trial hearing when he "told [Appellant] to consider agreeing with [the petition]," and at the April 3, 1997 unrecorded conference when Judge Choy said Appellant's counsel "was wasting [the family court's] time."

On May 5, 1997, Judge Choy orally denied Appellant's motion to disqualify him. The trial on the matter proceeded that same day, and at its conclusion, the family court orally ruled that Appellant was Child's natural father as follows:

Regarding the material allegations contained in this petition, [the family court] believes that the material allegations have

---

7. The motion did not identify the indispensable party.

been proved by clear and convincing evidence.

That [Appellant] is the biological father of [Child].

[The family court] further believes by clear and convincing evidence that the presumption that [Roe] who is married to [Mother], as being the father of [Child] has been rebutted.

### D.

On May 13, 1997, CSEA moved for attorneys' fees pursuant to HRS § 584-16 [8] and Hawai'i Family Court Rules (HFCR) Rule 68.

On May 22, 1997, the family court heard the motion for attorneys' fees and, after determining that HFCR Rule 68 was inapplicable, orally granted the motion based on HRS § 584-16.

On May 30, 1997, the family court entered a written order granting CSEA's motion for attorneys' fees. ·

### E.

On May 28, 1997, the family court entered: (1) a written judgment which adjudged, *inter alia*, Appellant to be the natural father of Child (the judgment); (2) findings, conclusions, and order denying Appellant's motion to disqualify Judge Choy; and (3) findings, conclusions, and order denying Appellant's motion to dismiss the petition.

On June 20, 1997, Appellant appealed the judgment; the findings, conclusions, and order denying Appellant's motion to disqualify Judge Choy; the findings, conclusions, and order denying Appellant's motion to dismiss the petition; and the family court's May 22, 1997 oral order granting CSEA's motion for attorneys' fees.

### II.

Appellant first argues that the family court erred, as a matter of law, in determining that

8. HRS § 584-16 (1993) provides:
    The court may order reasonable fees of counsel, experts, and the child's guardian ad litem, and other costs of the action and pretrial proceedings, including genetic tests, to be

"[p]ursuant to [HRS] § 584-6, [CSEA] ha[d] statutory standing to bring [the petition]." "The interpretation of a statute is a question of law which [an appellate] court reviews *de novo.*" *State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73, *reconsideration denied,* 78 Hawai'i 474, 896 P.2d 930 (1995). When interpreting a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature[,] which is to be obtained primarily from the language contained in the statute itself." *Id.* (internal quotation marks and citations omitted). After examining HRS §§ 576D-3 and 584-6, we believe that the family court correctly ruled that CSEA was permitted to bring the paternity action against Appellant.

### A.

HRS chapter 576D sets forth CSEA's powers and duties regarding child support matters, including paternity actions. HRS § 576D-3 provides, in pertinent part:

(a) [CSEA] shall undertake any legal or administrative action to secure support for a child by enforcing an existing court order or obtaining a court order of support.

(b) In order to carry out its responsibilities imposed under this chapter, [CSEA] ... may commence or appear in any proceeding before any court or administrative agency *for the purpose of establishing paternity for children born out of wedlock or for the purpose of obtaining,* enforcing, or modifying *an order of support on behalf of any dependent or any other person for whom [CSEA] has a duty to obtain or enforce an order for support under this chapter.* [CSEA] may commence or appear in any action on its own behalf, on behalf of any dependent child or custodial parent, or on behalf of any other person for whom [CSEA] has a duty to obtain or enforce an order of support under this chapter. *[CSEA] shall obtain or enforce a child support order for the following children:*

    paid by the parties in proportions and at times determined by the court. The court may order the proportion of any indigent party to be paid by the State, or such person as the court shall direct.

. . . .

(3) *A child on whose behalf a custodial parent ... applies to [CSEA] for assistance in obtaining* or enforcing *a child support order, regardless of whether public assistance payments have been made on the child's behalf.*

(Emphases added.)    HRS § 576D–4 then provides that

[w]hen necessary to obtain child support for a child under [HRS § ] 576D–3, [CSEA] *shall* take any legal or administrative action *to establish the paternity of the child.*    [CSEA] shall undertake the action on behalf of the State, child, custodial parent of the child, or any other person for whom [CSEA] has a duty to obtain or enforce a child support order.

(Emphases added.)

HRS § 584–6(a) also provides, in relevant part, that "[CSEA] may bring an action for the purpose of declaring the existence or nonexistence of the father and child relationship[.]" [9]

In our view, CSEA properly commenced the paternity action here under its statutory grants of authority.

## B.

■ We first disagree with Appellant's contention that because Child was born "in wedlock," CSEA was not acting pursuant to its authority under HRS § 576D–3(b) to bring an action to establish paternity for a child "born out of wedlock."  We believe that Child was "born out of wedlock" for purposes of HRS § 576D–3(b).

HRS § 584–4(a)(1) provides, in relevant part, that "[a] man is presumed to be the natural father of a child if ... [h]e and the child's natural mother are or have been married to each other and the child is born during the marriage...."  Since Roe and

Mother were married when Child was born, Appellant reasons, Child was not born out of wedlock, and CSEA was not authorized to bring a paternity action regarding Child.

The words "born out of wedlock" are not defined in HRS chapters 576D or 584.  However, the phrase has been defined as referring to "[c]hildren whose parents are not, and have not been, married to each other *regardless of marital status of either parent with respect to another.*"  *Black's Law Dictionary* 184 (6th ed.1990) (emphasis added).  "Thus, a child born to a married woman but 'begotten' by one other than her husband is a child 'born out of wedlock.' "  N. Vitek, *Disputed Paternity Proceedings* § 1.01[2][a], at 1–4 (5th ed.1997).  *See also* HRS § 338–21 (1985) (referring to children "born out of wedlock, *irrespective of the marriage of either parent to another*") (emphasis added).

Although Appellant asserts that the definition of "born out of wedlock" has "been altered by HRS [§ ] 584–4 which makes a child born during the marriage [born] 'in wedlock[,]' " we do not interpret the HRS § 584–4(a) presumptions of paternity as changing the definition of "born out of wedlock."  We reach this conclusion by looking to HRS § 338–21, which employed the phrase "born out of wedlock" both before and after HRS chapter 584 was enacted.[10]  Prior to the adoption of the Hawai'i UPA in 1975, HRS § 338–21 (1968), concerning the "legitimation" of children born out of wedlock, provided, in pertinent part: "All children *born out of wedlock, irrespective of the marriage of either parent to another,* become legitimate on the marriage of the parents with each other...."  (Emphasis added.)  It is evident from the emphasized language that under this statute, a child born to a married mother was not considered at birth to be born "in wedlock" unless the mother was married to the child's natural father.

---

**9.**  HRS § 584–6(a)(2) (1993) further provides, in relevant part:

(a) [The CSEA] may bring an action for the purpose of declaring the existence or nonexistence of the father and child relationship within the following time periods:

. . . .

(2) If the child has not become the subject of an adoption proceeding, within three years

after the child reaches the age of majority. . . .

**10.**  In 1993, HRS § 338–21 (1985) was amended to refer to children "born to parents not married to each other" rather than children "born out of wedlock."  1993 Haw. Sess. L. Act 131, § 3, at 186.

In the same 1975 act adopting HRS chapter 584, including its presumptions of paternity, the legislature also amended HRS § 338–21, *see* 1975 Haw. Sess. L. Act 66, §§ 1, 2(4), at 115, 126, to read, in pertinent part, as follows:

> (a) All children *born out of wedlock, irrespective of the marriage of either parent to another,* become legitimate (1) on the marriage of the parents with each other, (2) on the voluntary, written acknowledgement of paternity by the father and mother, or (3) *on establishment of the parent and child relationship under [HRS] chapter [584]* . . . .

1975 Haw. Sess. L. Act 66, § 2(4), at 126; HRS § 338–21 (Supp.1975) (emphases added). This amendment was made "to conform [HRS § 338–21 and other statutes] relating to public health statistics and birth certificates with the provisions of [Hawai'i's UPA]." Hse. Stand. Com. Rep. No. 190, in 1975 House Journal, at 1020. We observe that even with the enactment of the paternity presumptions in HRS chapter 584, the legislature continued to define "born out of wedlock" in HRS § 338–21 as including a child born to a married mother, if the mother was not married to the child's natural father when the child was born. In doing so, we conclude, the legislature did not intend the HRS § 584–4(a)(1) paternity presumption to alter the definition of "born out of wedlock" used in HRS § 338–21.

Mother's allegation that Appellant, not Roe, is Child's natural father and the corresponding allegation in CSEA's petition bring Child within the definition of "born out of wedlock." Accordingly, CSEA was authorized to bring an action to establish the paternity of Child, a child "born out of wedlock" for purposes of HRS § 576D–3(b).

### C.

■ Such an action was necessary for CSEA to obtain a child support order for Child, as authorized under HRS §§ 576D–3(b) and –4.

Mother requested assistance from CSEA in establishing paternity, apparently for the purpose of obtaining a child support order against Appellant.[11] Child is thus "[a] child on whose behalf a custodial parent . . . applie[d] to [CSEA] for assistance in obtaining . . . a child support order," HRS § 576D–3(b)(3), and hence, CSEA was authorized to "commence . . . a proceeding before any court or administrative agency . . . for the purpose of obtaining . . . an order of support on behalf of" Child, HRS § 576D–3(b). Although Appellant repeatedly asserts that Child was not in need of public assistance, HRS § 576D–3(b)(3) clearly permits CSEA to obtain a child support order, *"regardless of whether public assistance payments have been made on the child's behalf."* (Emphasis added.)

Appellant contends that "[a] request by a parent for child support only allows [CSEA] to obtain or enforce [child support] orders and nothing further." Yet, HRS § 576D–4 mandates that CSEA bring an action to establish the child's paternity "[w]hen necessary to obtain child support for a child under [HRS § ] 576D–3[.]"

Appellant argues that it was not necessary to establish paternity or obtain child support because Child "already ha[d] a father by statute who [was] able to support [Child]" and that "[a] mere request for governmental assistance should never be sufficient cause to allow [CSEA] or any other state agency . . . to tear a family apart without some overriding governmental interest." Such arguments are irrelevant under HRS §§ 576D–3(b) and –4. As demonstrated by the plain language of these sections, the legislature has already determined that a request by a child's custodial parent for assistance in obtaining a child support order authorizes CSEA to file a paternity action when necessary to obtain such an order. These circumstances were present in the instant case.

---

**11.** At the trial in this case, Mother affirmed that she had "appl[ied] for services from [CSEA] . . . to establish paternity[.]" Appellant apparently does not dispute that Mother applied to CSEA for assistance in obtaining child support from Appel- lant. In his opening brief, Appellant refers to "[CSEA's] arguments that, *because [Mother] requested support payments,* [CSEA] had the power to file a paternity action against [Appellant.]" (Emphasis added.)

### III.

Appellant next contends that the family court erred in "transferr[ing] the burden of proof to [Appellant] to prove he was not the father" when the family court informed Appellant during the April 3, 1997 conference that he had the burden of proof to overcome the statutory presumption of paternity under HRS § 584–4(a)(5). Also, according to Appellant, the family court should have ordered that CSEA overcome the paternity presumption pointing to Roe under HRS § 584–4(a)(1) before pursuing the action against Appellant. Moreover, according to Appellant, because there were two competing paternity presumptions, one implicating Roe under HRS § 584–4(a)(1) and the other, Appellant under HRS § 584–4(a)(5), the family court should have decided in favor of the former because it was supported by the "weightier policy considerations." We cannot agree with any of these contentions.

### A.

Initially, we observe that HRS § 584–4(a) sets forth several presumptions of paternity that are triggered if certain conditions are met. As noted above, the HRS § 584–4(a)(1) presumption states, in pertinent part, that "[a] man is presumed to be the natural father of a child if ... [h]e and the child's natural mother are or have been married to each other and the child is born during the marriage[.]" The other relevant presumption, HRS § 584–4(a)(5), provides, in relevant part:

> A man is presumed to be the natural father of a child if ... [p]ursuant to [HRS § ] 584–11 [ (Supp.1996) [12]], he submits to court[-]ordered genetic testing and the results, as stated in a report prepared by the testing laboratory, do not exclude the possibility of his paternity of the child; provided the testing used has a power of exclusion greater than 99.0 per cent and a minimum combined paternity index of five hundred to one[.]

HRS § 584–4(b) states that "[a] presumption under [HRS § 584–4(a) ] may be rebutted in an appropriate action only by clear and convincing evidence." Thus, CSEA correctly points out that the statutory presumptions of paternity under HRS § 584–4(a) are rebuttable, despite Appellant's citation to prior common law indicating that the presumption now codified in HRS § 584–4(a)(1) was irrebuttable in some circumstances. To guide a court faced with two conflicting presumptions, HRS § 584–4(b) further states that "[i]f two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls."

### B.

As to Appellant's initial objection, we do not believe the family court erred at the April 3, 1997 conference by stating that the burden of proof for overcoming the statutory presumption under HRS § 584–4(a)(5) was on Appellant. Appellant's genetic test results did not "exclude the possibility of his paternity" of Child, HRS § 584–4(a)(5), as they reported a probability of paternity of 99.84% and a combined paternity index of 643 to 1. As we have noted, HRS § 584–4(b) specifically permits the paternity presumptions to be rebutted by clear and convincing evidence.

The burden of disproving a presumption by clear and convincing evidence is on the party attempting to rebut it. *See Carr v. Strode,* 79 Hawai'i 475, 488, 904 P.2d 489, 502 (1995) (concluding that because the defendant doctor did not rebut, by clear and convincing evidence, the HRS § 584–4(a)(1) presumption that the mother's husband was the child's natural father, "the unrebutted presumption carried [the mother's and the husband's] burden of proving that [the doctor's] performance of [a vasectomy on the husband] was a substantial factor in causing [the child's] unplanned birth"). Since the requirements of HRS § 584–4(a)(5) were satisfied, a presumption arose that Appellant was the natural father of Child. The only party

---

**12.** HRS § 584–11 (Supp.1996) sets forth the procedures and requirements for genetic tests to determine paternity.

attempting to rebut that presumption was Appellant, and, thus, the burden of proof to rebut it was properly on him. At the April 3, 1997 conference, the family court simply informed Appellant of that fact, and in doing so did not improperly shift the burden of proof onto Appellant.

### C.

### 1.

■ Appellant argues that CSEA should have been *required* to first rebut the HRS § 584–4(a)(1) paternity presumption before proceeding against him. To support this contention, Appellant relies heavily on other states' decisions that have interpreted the UPA to accord great weight to the presumption of paternity in favor of the mother's husband (or the "presumption of legitimacy," as Appellant refers to it). Because of the strength of this presumption, Appellant contends, we should follow other states and rule that this presumption must be rebutted before evidence of any other presumption is received.

Examining both the UPA and Hawai'i's version of it, we do not find Appellant's reasoning persuasive. In particular, we look to UPA §§ 6(a) and (b), 9B U.L.A. at 302, and their counterpart in HRS § 584–6(a) governing the commencement of paternity actions. Material differences between these statutory sections lead us to conclude that the Hawai'i legislature did not intend that the presumption of paternity in HRS § 584–4(a)(1) be accorded more weight than, and thus, must

be resolved before, other presumptions, including the one found in HRS § 584–4(a)(5).

UPA §§ 6(a) and (b) provide:

(a) A child, his [or her] natural mother, or a man presumed to be his [or her] father under Paragraph (1), (2), or (3) of [UPA § ] 4(a),[13] may bring an action

(1) at any time for the purpose of declaring the existence of the father and child relationship presumed under Paragraph (1), (2), or (3) of [UPA § ] 4(a); or

(2) for the purpose of declaring the non-existence of the father and child relationship presumed under Paragraph (1), (2), or (3) of [UPA § ] 4(a) only if the action is brought within a reasonable time after obtaining knowledge of relevant facts, but in no event later than [five] years after the child's birth. *After the presumption has been rebutted, paternity of the child by another man may be determined in the same action, if he has been made a party.*

(b) Any interested party may bring an action at any time for the purpose of determining the existence or non-existence of the father and child relationship presumed under Paragraph (4) or (5) of [UPA § ] 4(a).[14]

UPA § 6, 9B U.L.A. at 302 (emphasis added) (some brackets added and some in original). As the emphasized language demonstrates, when a child has a presumed father based on one of the presumptions arising from the actual or attempted marriage of the child's mother, i.e., those found in UPA §§ 4(a)(1), (2) and (3), that presumption must be rebutted *before* "paternity of the child by another man may be determined[.]" No such provi-

**13.** Paragraphs (1), (2), and (3) of UPA § 4(a), 9B U.L.A. at 298–99, are identical to subsections (1), (2), and (3) of HRS § 584–4(a) (1993). HRS § 584–4(a)(1) concerns the presumption of paternity when the mother is married at the time of the child's birth or when a child is born "within 300 days" after the marriage is duly terminated; HRS §§ 584–4(a)(2) and –4(a)(3) concern situations where the natural mother has attempted to marry within that time period.

**14.** Subsections (4) and (5) of UPA § 4(a), 9B U.L.A. at 299, are substantially similar to subsections (4) and (6) of HRS § 584–4(a). HRS § 584–4(a)(4) concerns a man receiving a minor

child into his home and holding the child out as his own. HRS § 584–4(a)(6) (Supp.1997) concerns a man filing a voluntary acknowledgment of paternity with the State of Hawai'i Department of Health. Unlike its counterpart in UPA § 4(a)(5), HRS § 584–4(a)(6) does *not* require any other paternity presumption in effect to be rebutted or for the presumed father to give written consent before an acknowledgement by another man under that section may be effective.

The HRS § 584–4(a)(5) presumption, at issue in this case, does not have a counterpart in the UPA. The HRS § 584–4(a)(5) presumption was added to HRS chapter 584 in 1995. 1995 Haw. Sess. L., Act 106 § 1, at 176.

sion appears in HRS § 584–6(a) or elsewhere in Hawai'i's version of the UPA. Accordingly, the Hawai'i legislature has not mandated that the presumption of paternity in HRS § 584–4(a)(1) be rebutted before a paternity action against another man can be brought. In other words, the legislature did not accord more weight to the HRS § 584–4(a)(1) presumption than to other presumptions.

This conclusion is also supported by comparing another aspect of UPA §§ 6(a) and (b) with HRS § 584–6(a). As noted above, these sections govern the commencement of paternity actions, setting forth both *who* may bring such an action and *when* it may be brought. Under the UPA, greater restrictions apply where the presumptions based on marriage or attempted marriage are attacked, *see* UPA § 6(a)(2), than in actions disputing the other presumptions, which are not based on marriage or attempted marriage, *see* UPA § 6(b):

> Attack on the presumptions based on marriage or on a relationship between the parents that resembles marriage is restricted to a limited circle of potential contestants and in point of time. Presumptions created in other circumstances may be attacked more freely.

UPA § 6 comment, 9B U.L.A. at 303. As such, UPA § 6 assigns greater significance to the marriage and attempted marriage presumptions, by limiting who may challenge these presumptions and when they may do so.

In contrast, under HRS § 584–6(a), the same parties are permitted to "bring an action for the purpose of declaring the existence or nonexistence of the father and child relationship" regardless of which presumptions will be disputed in the action. Furthermore, HRS § 584–6(a) sets forth the applicable time periods in which a paternity proceeding may be brought according to whether or not the child "is the subject of an adoption proceeding," *not* according to any presumption to establish or disestablish paternity, as in UPA §§ 6(a) and (b). These differences between UPA §§ 6(a) and (b) and HRS § 584–6(a) counsel against the conclusion that any one of the presumptions in

HRS § 584–4(a) be accorded greater weight than any other.

### 2.

■ We recognize that in certain cases the presentation of HRS § 584–4(a)(1) presumption evidence may appropriately precede evidence concerning the HRS § 584–4(a)(5) presumption. At the same time, HRS § 584–4(b) appears to encompass situations where evidence supporting two or more presumptions may be offered, since that section instructs a court as to how conflicting presumptions should be treated. We note, further, that the order of proof at trial is generally governed by the trial court's wide discretion. Hawai'i Rules of Evidence Rule 611 commentary.

### 3.

■ In any event, we agree with the family court's ruling that "[b]ased on the clear and convincing evidence, the presumption of paternity [in favor] of Roe [was] rebutted[.]" The certificate of live birth for Child did not name Roe as Child's father. Roe disavowed being Child's natural father. Both Mother and Roe testified that they were separated from each other from May 1995 through April 1996 and did not have sexual relations during that period. Mother also testified that during that time, Appellant was the only man with whom she had sexual relations. Mother declared that she had had sexual relations with Appellant on September 16, 1995, and more than twenty times during the three months in which she and Appellant dated. Child was born on June 14, 1996 and Mother affirmed that he was a "full[-]term baby[.]"

In sum, there was testimony that Mother and Roe did not have sexual relations during the time in which Child was conceived, and that Mother and Appellant did have sexual relations around the time of conception. The family court apparently believed this testimony, and we defer to its determination of the witnesses' credibility. *Doe IV v. Roe IV,* 5 Haw.App. 558, 568, 705 P.2d 535, 544, *reconsideration denied,* 5 Haw.App. 682, 753 P.2d 253 (1985). "Clear and convincing" evidence

has been defined by the Hawai'i Supreme Court as follows:

"[C]lear and convincing" evidence may be defined as an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases. It is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable.

*Masaki v. General Motors Corp.*, 71 Haw. 1, 15, 780 P.2d 566, 574, *reconsideration denied*, 71 Haw. 664, 833 P.2d 899 (1989). In our view, the foregoing evidence was clear and convincing evidence sufficient to rebut the presumption that Roe was Child's natural father. *See Shadwick v. Byrd*, 867 S.W.2d 231, 235 (Mo.Ct.App.1993) (concluding that evidence of a separation and no sexual relations between the mother and her husband during the "possible period of conception" "clearly rebutted the presumptive paternity" of the husband).

Consequently, even if we were to concur with Appellant's contention that CSEA should have been required to first rebut the presumption that Roe was the natural father, we find that the presumption in favor of Roe would have been rebutted, as it was in fact rebutted at trial.

#### D.

■ HRS § 584-4(b) provides direction regarding conflicting presumptions, but HRS § 584-4 does not indicate at what stage a conflict between presumptions must be resolved. Because HRS § 584-4(b) permits a presumption to be rebutted by clear and convincing evidence, logically, a conflict arises only if one of the presumptions has not been rebutted. As we have noted, the paternity presumption in favor of Roe was rebutted by clear and convincing evidence. Appellant does not point to any evidence demonstrating the rebuttal of the HRS

§ 584-4(a)(5) presumption that he is Child's natural father. As such, the only remaining presumption was that Appellant was Child's natural father, and no conflict existed between two or more HRS § 584-4(a) presumptions. Therefore, contrary to Appellant's claim, that part of HRS § 584-4(b) which calls for the resolution of conflicting HRS § 584-4(a) presumptions was not applicable to the instant case and the family court was not required to choose between conflicting presumptions.

#### IV.

The family court also erred, according to Appellant, "when it failed to order an informal [pre-trial] hearing" pursuant to HRS § 584-10 for the following purposes: (1) to evaluate the probability of establishing that Appellant was Child's natural father; (2) to consider whether Child's best interest lay in a declaration of paternity; (3) to determine whether genetic testing should be ordered; and (4) to make a settlement recommendation to the parties. To the contrary, we conclude that both HRS § 584-10 and the related provisions of HRS § 584-13 were satisfied in this case.

#### A.

HRS § 584-10 provides for an informal, pre-trial hearing:

As soon as practicable after an action to declare the existence or nonexistence of the father and child relationship has been brought, an informal hearing shall be held. The public shall be barred from the hearing. A record of the proceeding or any portion thereof shall be kept if any party requests, or if the court orders. Rules of evidence need not be observed.

HRS § 584-10 is identical to UPA § 10(a), 9B U.L.A. at 314. The commentary to UPA § 10 states, "[UPA §§ ] 10 through 13[15] provide details concerning the pre-trial hearing. The purpose of the pre-trial hearing is to minimize inconvenience and embarrass-

---

15. Hawai'i has adopted UPA §§ 10 through 13, 9B U.L.A. at 314–21, in a substantially similar form and has codified these sections as HRS §§ 584–10 through 13, respectively. HRS

§ 584–11 sets forth genetic testing requirements and procedures, and HRS § 584–12 (Supp.1996) lists what evidence of paternity may be introduced.

ment in the many cases which the Committee [on a Uniform Parentage Act of the National Conference of Commissioners on Uniform State Laws] expects will be resolved on the basis of voluntary compromise contemplated by [UPA § ] 13." UPA § 10 comment, 9B U.L.A. at 315.

HRS § 584–13, which is almost identical to UPA § 13, 9B U.L.A. at 320–21, sets out the court's duties with respect to the informal hearing:

(a) *On the basis of the information produced at the pre-trial hearing, the judge conducting the hearing shall evaluate the probability of determining the existence or nonexistence of the father and child relationship in a trial and whether a judicial declaration of the relationship would be in the best interest of the child. On the basis of the evaluation, an appropriate recommendation for settlement shall be made to the parties,* which may include any of the following:

(1) That the action be dismissed with or without prejudice;

(2) That the matter be compromised by an agreement among the alleged father, the mother, and the child, in which the father and child relationship is not determined but in which a defined economic obligation is undertaken by the alleged father and, if appropriate, in favor of the mother, subject to approval by the judge conducting the hearing . . . .; or

(3) *That the alleged father voluntarily acknowledge the paternity of the child.*

(b) If the parties accept a recommendation made in accordance with subsection (a), judgment shall be entered accordingly.

(c) If a party refuses to accept a recommendation under subsection (a) and genetic tests, including blood tests, have not been taken, the court shall require the parties to submit to genetic tests, if practicable. Thereafter the judge shall make an appropriate final recommendation. If a party refuses to accept the final recommendation, the action shall be set for trial.

(d) The guardian ad litem may accept or refuse to accept a recommendation under this section.

(e) *The informal hearing may be terminated and the action set for trial if the judge conducting the hearing finds it unlikely that all parties would accept a recommendation he [or she] might make under subsection (a) or (c).*

(Emphases added.) According to the UPA commentary, "[t]he settlement procedures contemplated by [UPA § 13] are voluntary. If any party refuses to accept a settlement recommendation, the action will be set for trial." UPA § 13 comment, 9B U.L.A. at 321.

## B.

■ Before considering Appellant's assertions regarding an informal hearing, we state our disagreement with CSEA's premise that "there is no requirement that an informal hearing must be held to determine whether or not paternity is in the best interest of the child." According to CSEA, "HRS § 584–13(a)'s requirement that the court make a finding regarding whether a paternity determination will be in the child's best interest is only if the court intends to make a recommendation for settlement."

However, HRS § 584–10 mandates that an informal hearing be held after a paternity action is brought; HRS § 584–13(a) then provides that, using the information gained from this hearing, the court *"shall* evaluate" both the likelihood of determining that the alleged father is the natural father *"and* whether a judicial declaration of the [father-child] relationship would be in the *best interest of the child."* (Emphases added.) Reading these statutory commands together, it is evident that an informal, pre-trial hearing must be held, and that one of the purposes of such a hearing is for the court to consider whether declaring the alleged father to be the natural father would be in the best interest of the child. Furthermore, after the court makes this evaluation and an assessment as to the likelihood of establishing paternity, the statute states that the court *"shall"* make "an appropriate recommendation for settlement" to the parties. HRS

§ 584–13(a) (emphasis added). The language of HRS 584–13(a) does not leave these steps to the discretion of the court, although the court does have discretion in the substance of its settlement recommendation, as indicated by HRS §§ 584–13(a)(1), (2), and (3).

### C.

Turning to Appellant's informal hearing challenges, we believe, first, there was a hearing to evaluate the probability that Appellant was Child's natural father. At the February 20, 1997 hearing, the family court observed that the first genetic test indicated a 99.84% probability of paternity for Appellant. Noting that Roe had declared that he was not Child's father, the family court told the parties that it anticipated CSEA would demonstrate that Roe was not the father. After granting Appellant's motion for a second genetic test, the family court informed Appellant's counsel what would happen after the results of that test were completed: "If [Appellant is] excluded I'll dismiss him off. If he comes up with another 99 percent you can demand trial or schedule a trial. I can schedule your trial within less than a month." Thus, an evaluation of the likelihood of adjudging Appellant as the natural father appears to have been made, in accordance with HRS § 584–13(a).

### D.

Likewise, we cannot say that the best interests of Child were not considered, contrary to Appellant's claims. Although the family court did not formally find that a judicial declaration of Appellant as Child's natural father would be in Child's best interest, HRS § 584–13 does not require that such a finding be expressed.[16] Moreover, this court has previously held that "[a] pre-sumptively legitimate child of questionable parentage should know the truth of [his or] her parentage—both, if there is a difference, [his or] her natural and [his or] her legal parentage." *Doe v. Roe,* 9 Haw.App. 623, 626–27. 859 P.2d 922, 924 (1993) (internal quotation marks omitted). Additionally, our supreme court has recognized that "[t]he purpose of paternity actions is not to impose a penalty, but to convert a father's moral obligation to support his illegitimate children into a legal obligation." *Roe v. Doe,* 59 Haw. 259, 265, 581 P.2d 310, 314 (1978) (internal quotation marks and citation omitted).

Because Roe has disavowed his paternity of Child,[17] there appears to be no detriment to Child's interest as a result of proceeding against Appellant. This view was expressed in *Ex parte Presse,* 554 So.2d 406 (Ala.1989), where the Alabama Supreme Court noted that when a mother's husband disavows paternity, there is no impediment to seeking to establish the child's natural father:

> "The case of the married mother who brings into the world a child of someone not her husband lies differently. But it is not a difficult case either. *The application of the presumption of legitimacy of a child born to a married woman would be in the child's interest in practically all cases. If the mother's husband does not disavow paternity, there is no reason to go after the child's true father.* Whatever the current weight of the family protection argument may be, it certainly should prevent the illegitimate father from seeking to assert his claim to a child resulting from his union with a married mother. *If, on the other hand, the mother's husband has disavowed paternity, no obstacle lies in the way of pursuing the child's father."*

*Id.* at 413 (quoting H. Krause,[18] *Illegitimacy: Law and Social Policy* 77 (1971)) (emphases added).

---

16. We observe, however, for future cases, that when informal, pretrial hearings are placed on the record, it would be advisable for the court to state on the record its findings with respect to the probability of determining the alleged father to be the natural father and the effect of a judicial declaration of this on the best interest of the child. The court should also, when the informal hearing is recorded, explicitly state its settlement recommendation to the parties.

17. In his opening brief, Appellant states that CSEA "persuaded" Roe to sign the appearance and waiver, in which he disavowed paternity of Child, for no apparent reason. Appellant cites nothing in the record, nor does anything appear to us, to support this suggestion that CSEA acted improperly with respect to Roe's appearance and waiver.

18. Harry D. Krause was the reporter-draftsman to the Committee on a Uniform Parentage Act of the National Conference of Commissioners on

### E.

■ Appellant asserts that the family court erred by not ordering an informal hearing before ordering genetic tests. HRS § 584–13(c) contradicts this assertion, as it provides that "[i]f a party refuses to accept a [settlement] recommendation under [HRS § 584–13(a) ] and genetic tests, including blood tests[,] *have not been taken,* the court shall require the parties to submit to genetic tests, if practicable." (Emphasis added.) This section contemplates that genetic tests may be taken *prior* to the informal hearing that provides information for the court's settlement recommendation.

■ We also disagree with Appellant's contention that genetic tests are not mandatory. HRS § 584–11 provides, in pertinent part, for genetic tests: "(a) The court may, and upon request of a party *shall,* require the child, mother, or alleged father to submit to genetic tests, including blood tests." (Emphasis added.) Because genetic testing is mandatory when requested by a party,[19] the statute does not confer discretion on the family court to consider the best interest of the child before ordering such tests. We note, also, that HRS § 584–13(c), quoted above, states that "the court *shall* require

the parties to submit to genetic tests, if practicable" if such tests have not already been performed by the time the court makes its initial settlement recommendation to the parties.

■ Further, the record indicates that on October 25, 1996, Appellant and Mother orally stipulated to an order regarding genetic testing.[20] Although there is no transcription of the October 25, 1996 oral stipulation, the record does indicate that the parties informed the family court of their agreement on that date. Because Appellant stipulated to genetic testing, his argument that a hearing should have been held before the family court ordered genetic testing is not compelling.

### F.

With respect to whether an appropriate settlement recommendation was made as required by HRS § 584–13(a), we observe that Appellant alleges that at the February 20, 1997 hearing, the family court told him to "seriously consider" agreeing with CSEA's petition.[21] If this statement was made, it would appear to comport with the family court's duty under HRS § 584–13 to recom-

Uniform State Laws. *Ex parte Presse,* 554 So.2d 406, 413 (Ala.1989)

19. In 1997, the legislature amended HRS § 584–11(a) to require that if the party who requests the genetic testing is the mother or the alleged father, that party must make his or her request "pursuant to a sworn statement" which either "[a]llege[s] paternity setting forth facts establishing a reasonable possibility of the requisite sexual contact between the parties" or "[d]en[ies] paternity setting forth facts establishing a reasonable possibility of the non-existence of sexual contact between the parties." HRS § 584–11 (Supp.1997); 1997 Haw. Sess. L., Act 293 § 43, at 678.

Act 293 also amended HRS § 584–11(e) (1993) regarding the admission of genetic test reports, and added a new section, HRS § 584–11(f), providing that "[s]hould an original test be contested, the court shall order further genetic testing with payment of the testing to be advanced and paid for by the contesting party." HRS § 584–11 (Supp.1997); 1997 Haw. Sess. L., Act 293 § 43, at 679. These amendments became effective on June 21, 1997, after the judgment was filed in the instant case. 1997 Haw. Sess. L., Act 293 § 50, at 680.

20. In his opening brief, Appellant claims that although he signed the stipulated order regarding genetic testing, Deputy Corporation Counsel Mark Au misrepresented the contents of the stipulation as a document for change of address. Appellant also asserts that before he signed the stipulation, he was not advised that he should seek legal counsel and have counsel review the document. Appellant, however, fails to present discernible argument with respect to these allegations and this court, therefore, need not address those matters. *Loui v. Board of Medical Examiners,* 78 Hawai'i 21, 29 n. 19, 889 P.2d 705, 713 n. 19 (1995); *Hall v. State,* 10 Haw.App. 210, 218, 863 P.2d 344, 348, *cert. denied,* 76 Hawai'i 246, 75 Haw. 581, 868 P.2d 464 (1993). Moreover, the stipulated order clearly provides, *immediately above and on the same page as Appellant's signature,* that "any . . . party to this proceeding [other than CSEA] . . . has the right to secure their [sic] own attorney to represent him or her in this proceeding," and that the document was an "Order Regarding Genetic Testing[.]"

21. A statement to this effect does not appear in the transcript of the February 20, 1997 hearing.

mend an appropriate settlement to the parties.

As we have indicated previously, the family court met informally with the parties on April 3, 1997 to discuss a trial date after Appellant failed to complete the second genetic test as scheduled.[22] This unrecorded conference followed Appellant's affirmation to the family court that he wanted a trial. HRS § 584–13(c) provides that after genetic tests have been performed, the court "shall make an appropriate final recommendation. If a party refuses to accept the final recommendation, the action shall be set for trial." When it became apparent by April 3, 1997 that a *second* genetic test would not be performed, the family court set a trial date, as required by HRS § 584–13(c).

Appellant appears to construe HRS § 584–13 as requiring the court to recommend that the matter be "compromised" for a financial obligation under HRS § 584–13(a)(2), rather than, as he states, "trying to persuade Appellant to agree[ ] to paternity only." However, HRS § 584–13(a) states that the court's settlement recommendation "*may* include" a recommendation to dismiss, to compromise by agreement, or for "the alleged father [to] voluntarily acknowledge his paternity of the child." HRS §§ 584–13(a)(1), (2), and (3) (emphasis added).

### V.

In conjunction with his arguments regarding Child's best interests, Appellant contends that the family court erred by denying his motion to dismiss for failure to join Child as an indispensable party, and to have a guardian ad litem appointed on Child's behalf.[23]

In the findings, conclusions, and order denying Appellant's motion to dismiss the petition, the family court ruled that "[Child] is not an indispensable party to this action." In the findings of fact, conclusions of law, and order denying Defendant's motion to set aside trial date, the family court concluded that "[i]n paternity cases, a guardian ad litem for the child is not a requirement." We believe these conclusions are correct.

### A.

As a matter of law, there is no requirement under Hawaiʻi's version of the UPA that a child be made a party to a paternity proceeding or that a guardian ad litem be appointed therein. HRS § 584–9(a) provides in its entirety as follows:

> The child *may* be made a party to the action and *may* be represented by the child's general guardian or a guardian ad litem appointed by the court. The child's mother or father shall not represent the child as guardian or otherwise. Subject to the provisions in [HRS § ] 584–6(e), the natural mother, each man presumed to be the father under [HRS § ] 584–4, and each man alleged to be the natural father, *shall be made parties*,[24] or, if not subject to the jurisdiction of the court, shall be given notice of the action in a manner prescribed by the court and an opportunity to be heard.

(Emphases added.)

The use of the term "may" indicates that the court has discretion in deciding whether the child should be made a party and be represented by a guardian ad litem.[25] In

**22.** Although Appellant frequently notes that this hearing was not recorded, Appellant does not claim that he or any party requested that a record be kept of that hearing, as provided for in HRS § 584–10 (1993).

**23.** Appellant did not file a motion to join Child as an indispensable party or to have a guardian ad litem appointed for Child. These issues appear to have been raised for the first time in Appellant's motion to dismiss, filed on April 16, 1997. Appellant moved to dismiss in part because "the Petition fail[ed] to name an indispensable party pursuant to [Hawaiʻi Rules of Civil Procedure] Rules 17 and 19[.]" Appellant then argued in support of his motion that "a Guardian Ad Litem

in [sic] an indispensable party to this Paternity Action."

**24.** This statute was amended in 1997 to include CSEA in the list of who should be made a party or be given notice, but only "if public assistance moneys are or have been paid for the support of the subject child[.]" HRS § 584–9(a) (Supp. 1997); 1997 Haw. Sess. L., Act 294 § 6, at 683.

**25.** We note that a provision in HRS chapter 571 (1993) governs whether a child should be made a party and whether a guardian ad litem should be appointed for the child "[w]henever, in any action involving the custody or support of a child

fact, the legislative history of HRS § 584–9 emphasized that "the appointment of a guardian for the child as a party to the [paternity] action is within the discretion of the court[.]" Hse. Stand. Com. Rep. No. 190, in 1975 House Journal, at 1019. The subsequent use of the term "shall" when describing other persons to be made parties to the paternity action further indicates that the legislature intended different treatment for the child and for the other persons listed. Additionally, Hawai'i's use of the term "may" with respect to the child as a party signifies a rejection of the UPA's requirements that "[t]he child *shall* be made a party to the action" and "if [the child] is a minor he [or she] *shall* be represented by his [or her] general guardian or a guardian ad litem appointed by the court." UPA § 9(a), 9B U.L.A. at 312 (emphasis added); *cf. Thomas v. Callen*, 521 So.2d 1322, 1323 (1987) (determining that there was no error in not joining the child in a paternity proceeding because Alabama's Uniform Parentage Act differs from the UPA in that Alabama's version does not require that the child be made a party to the paternity action, but, instead, provides that the child "may" be a party in such an action).

### B.

There may be circumstances in a case that compel the joining of a child and the appointment of a guardian. However, in this case, we do not find the reasons given by Appellant for doing so persuasive.

First, Appellant recounts the allegedly adverse effects of having Child's "status ... change from being a legitimate child to that of an illegitimate [child]." New Jersey has

considered that argument and, we believe, appropriately responded as follows:

> [The alleged biological father] purportedly seeks to shield [the subject child] from the 'stigma' of illegitimacy. The practical consequences of recognizing [the alleged biological father's] paternity are no different from those which result from divorce and remarriage, however. [The subject child] would have a different surname than his residential family and receive support from a father who resides elsewhere. Such circumstances are relatively common today and are unlikely to have any negative impact on the quality of [the subject child's] life. *Moreover, society's concern in shielding a child from the stigma of illegitimacy pales in comparison to its interest in securing financial support for a child's real needs for food, shelter, and clothing.*

*J.W.P. v. W.W.*, 255 N.J.Super. 185, 604 A.2d 695, 697 (1990) (emphasis added), *aff'd*, 255 N.J.Super. 1, 604 A.2d 603 (1991). As to this last point, we discern that Appellant appears to be at least as equally concerned about the adverse effects he believes he will suffer from a determination that he is Child's father. Appellant states in his opening brief that "[f]or [Appellant], it is a lose-lose situation because he not only would gain a son he does not really want, but he also would incur a significant financial burden of being required to pay child support payments for the next eighteen or so years—made worse because it is to someone he now finds personally reprehensible." A child's natural father should not be able to avoid his financial responsibility to his child because he did not intend to have a child and incur such responsibility.

---

apparently born in lawful wedlock, the legitimacy of the child is placed in issue[.]" HRS § 571–47 (1993); *see also* HRS § 571–47 (Supp.1997) (replacing the word "legitimacy" with the word "parentage"). This statute provides that "the court *may* make the child a party to the action" and that the court *"shall"* appoint a guardian ad litem to represent the interests of the child"; however, if the child is not made a party, "a determination that the child·is illegitimate shall not be binding upon the child." HRS § 571–47 (1993) (emphases added); *see also* HRS § 571–47 (Supp.1997) (replacing the words "is illegiti-

mate" with the phrase "was not born to parents married to each other at the time of the child's birth").

The parties have not addressed any potential inconsistencies between HRS §§ 584–9 and 571–47. We believe that when an action for child support and a determination of paternity is brought pursuant to HRS chapters 576D and 584, HRS § 584–9 controls the naming of the child as a party and the appointment of a guardian ad litem. If there are any inconsistencies between HRS §§ 584–9 and 571–47, they are appropriately left to the legislature to resolve.

Second, Appellant asserts that Child should have been represented because a determination that Appellant is Child's natural father would mean that Child would "lose whatever benefits that came [from] being [Roe's] son, such as medical and dental benefits through [Roe's] employment ..., any inheritance rights, any survivors' benefits ..., etc." We can assume that this argument would apply to any case in which the natural father of a Child is adjudged to be someone other than a man who is the presumed father. Appellant does not explain why such circumstances warrant a guardian ad litem for Child in this particular case.

Third, Appellant expresses concern for Child's "mental and emotional well-being ... as he grows up in a family that could very well treat him as an outsider and not as a fully accepted member of the family because of his parentage." We dismiss this contention as speculative at best.

Fourth, Appellant claims that "no one ha[d] [Child's] best interests in mind," since CSEA has "blindly forc[ed] the issue of [Appellant being the natural father] without regard as to how a change in paternity will affect [Child]." On the contrary, as we have pointed out, CSEA was fulfilling its statutory mandates. Also, we have already concluded that a declaration of paternity is not detrimental to Child's best interests.

Under the facts of this case, therefore, we conclude that the family court did not abuse its discretion in not ordering Child to be named a party and represented by a guardian ad litem.

## VI.

Finally, Appellant contends that the family court denied him due process in two ways: (1) by failing to give him prior notice of the April 3, 1997 hearing where the family court allegedly intended to set the trial date, cut off discovery, and make substantive rulings of law; and (2) by failing to provide a neutral and detached forum. We do not concur with these contentions.

### A.

As we have observed, no one objected to the family court's suggestion at the April 3, 1997 hearing that the parties meet with Judge Choy to set a trial date, and thus the parties met with Judge Choy on the same day.[26]

#### 1.

■ Appellant apparently finds fault with Judge Choy setting the trial for May 5, 1997 because a pre-trial hearing had been previously scheduled for June 5, 1997.

However, the record indicates that the June 5, 1997 pre-trial hearing was scheduled for the return of second genetic test results. At the time of the test request, the family court noted that "in the event [Appellant] decides not to do the [genetic] test we need to bring this back on calendar[.] ... June 5th [is] the return date for [the genetic] test." Because the need for the June 5, 1997 pre-trial hearing was obviated by Appellant's decision to forgo a second genetic test, cancellation of the June 5, 1997 pre-trial hearing was not a denial of due process.

#### 2.

Appellant complains that at the April 3, 1997 hearing, Judge Choy unilaterally cut off discovery. However, no order terminating discovery appears or is otherwise found in the record. Without an order providing otherwise, HFCR Rule 26(d) provides that "[m]ethods of discovery also may be used up to the date of trial so long as the trial is not delayed thereby." Appellant has not explained how he was prevented from proceeding with discovery, or what he believes he was prevented from discovering. Appellant has not shown how he was prejudiced from any purported termination of discovery. *Wakabayashi v. Hertz Corp.*, 66 Haw. 265, 275, 660 P.2d 1309, 1315–16 (1983) (observing that the exercise of the trial court's discretion regarding discovery matters "will not be disturbed in the absence of a clear abuse of

---

26. It is important to note that although Appellant emphasizes his assertion that the April 3, 1997 unrecorded conference with Judge Darryl Y.C. Choy (Judge Choy) was unnoticed and unscheduled, Appellant was in fact present at this conference.

discretion that results in substantial prejudice to a party").

If Appellant's contention that Judge Choy cut off discovery relates to the setting of the trial date on May 5, 1997 and cancelling of the June 5, 1997 pre-trial hearing, Appellant's argument must fail for the same reason discussed above, that the purpose of the June 5, 1997 hearing was negated when Appellant failed to schedule the second genetic test.

### 3.

Appellant contends that Judge Choy made a substantive ruling of law at the April 3, 1997 conference when Judge Choy told Appellant that he had the burden of proof to overcome the presumption of paternity under HRS § 584–4. We have already explained that this amounted to correctly informing Appellant of his burden to rebut the presumption that he was Child's natural father, not a substantive "ruling" of law.

### 4.

Without elaboration, Appellant generally argues that "he was denied 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" Appellant has not cited to any part of the record which would support this contention.

### B.

Appellant maintains that his right to due process was violated also because Judge Choy was not neutral and unbiased in deciding the case.[27] We cannot accept this argument.

### 1.

A motion to disqualify is normally brought pursuant to HRS § 601–7 (1993).[28]

Appellant's motion to disqualify Judge Choy did not comply with the HRS § 601–7 prohibition against filing more than one affidavit because Appellant filed two affidavits, his own and his counsel's. Further, Appellant's affidavit was not accompanied by a certificate by Appellant's counsel that the affidavit was made in good faith, as required by HRS § 601–7. Even if Appellant followed the proper disqualification procedure, we believe the family court's denial of the motion was proper, and thus Appellant was not denied due process in this manner.

### 2.

■■■ In reviewing a motion to disqualify "[w]here an affidavit is timely filed pursuant to HRS § 601–7(b), [an appellate court] must accept the facts alleged in the affidavit as true, and our only function is to determine whether the facts sufficiently establish a personal bias and prejudice." *Schutter v. Soong,* 76 Hawai'i 187, 205, 873 P.2d 66, 84 (1994).

■■■ The material averments in Appellant's affidavit are that Judge Choy stated that Appellant "should seriously consider agreeing to what [CSEA was] asking in its petition[,]" and that Judge Choy told Appellant's counsel that he was "wasting the Court's time[.]" However, "in order to establish a 'personal' bias, [Appellant] must be

27. Appellant raised these points below in his motion to disqualify Judge Choy. Appellant, however, has not directly argued that the family court erred in denying his motion to disqualify Judge Choy. Instead, on appeal, Appellant poses the issue as a denial of due process.

One of Appellant's contentions, raised for the first time in his reply brief, is that Judge Choy demonstrated his prejudice against Appellant by "curtailing trial time without warning at trial." Without any explanation given as to how Appellant was prejudiced by Judge Choy limiting the time for trial, we decline to address this contention.

28. HRS § 601–7 (1993) provides, in relevant part:

Whenever any party to any suit, action, or proceeding, civil or criminal, makes and files

an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice against the party or in favor of any opposite party to the suit, the judge shall be disqualified from proceeding therein. Every such affidavit shall state the facts and the reasons for the belief that bias or prejudice exists and shall be filed before the trial or hearing of the action or proceeding, or good cause shall be shown for the failure to file it within such time. *No party shall be entitled in any case to file more than one affidavit; and no affidavit shall be filed unless accompanied by a certificate of counsel of record that the affidavit is made in good faith.*

(Emphasis added.)

able to show 'marked personal feelings ... on both sides inflicting lingering personal stings.'" *Soong*, 76 Hawai'i at 205–06, 873 P.2d at 84–85 (citation omitted). Appellant has not met this burden.

### 3.

The record does not support Appellant's allegation that at the February 20, 1997 hearing, Judge Choy told Appellant "that he had better seriously consider agreeing with [CSEA's] petition for paternity." To support this claim, Appellant cites only his counsel's oral statement on May 5, 1997 in support of his motion to disqualify Judge Choy, that "[o]n February 20, 1997[,] I recall the [family court] telling or threatening [Appellant] that he had better seriously consider agreeing to [CSEA's] petition for paternity." A review of the February 20, 1997 hearing transcript fails to reveal such a statement.[29]

Even had Judge Choy made such a statement, as we have observed, HRS § 584–13(a) permits the family court to make a settlement recommendation. Pursuant to that provision, Judge Choy's comment could be viewed as a settlement recommendation.

### 4.

Because the April 3, 1997 hearing before Judge Choy was not recorded, the only mention in the record of Judge Choy telling Appellant's counsel that he was "wasting this Court's time" is in the affidavits attached to Appellant's disqualification motion. Appellant has not explained the surrounding circumstances or the context in which this alleged statement was made. Even had Judge Choy made that statement, we cannot determine that the statement was directed to the merits of Appellant's case so as to demonstrate any *personal* bias or prejudice.

**29.** In fact, Judge Choy stated:
When we come back on the 4th—5th, rather, of June and at that point the parties will decide what they want to do.
If your client comes back with other than 99 percent then it's up to him to decide if he wants to fight it.
. . . .
If he's excluded I'll dismiss him off.

### 5.

Appellant lastly contends that Judge Choy's oral order for child support at the February 20, 1997 hearing further illustrated that Judge Choy had "adjudged [Appellant to be Child's] father" even before the trial was held on May 5, 1997. At the February 20, 1997 hearing Judge Choy did order Appellant to pay child support, but suspended that obligation pending the outcome of the new genetic test:

I will order that child support guidelines be done today.

And I will order pending the outcome of the blood test that child support shall be effective and this is without prejudice to getting (indiscernible) . . . . filing the petition.

This will commence [in] March. He need not make any payments, though, [until] the blood results are in.

So, what's [going to] happen is that I'm [going to] order the calculation of child support. There will be an amount. Okay.

He will owe that amount every month until the blood test come [sic]. He is not to pay a cent, though, until the blood test result comes in.

If the blood test results excludes him then I'll vacate the order of child support.

*If the blood test results turn out that he is the father I'll order that it be a judgment.* He must pay. In other words, he can buy time but he can't buy time on the money.

(Emphasis added.)

The emphasized statement was erroneous because the results of the genetic test do not establish paternity, but can create a rebuttable presumption under HRS § 584–4(a) that Appellant is the natural father. The court must give a presumed father the opportunity to rebut this presumption before ordering a final judgment and support.[30] However, we

If he comes up with another 99 percent you can demand trial or schedule a trial. I can schedule your trial within less than a month.

**30.** This interpretation comports with the statutory provision for temporary support orders, added to Hawai'i's UPA in 1997. 1997 Haw. Sess. L., Act 293 § 8, at 654. HRS § 584–6.5 (Supp. 1997) states that "[i]n all contested paternity

have declared that Appellant did not produce evidence to rebut the presumption here. Furthermore, the record reveals that Judge Choy was aware that genetic testing is not determinative of paternity.[31] We therefore do not conclude that Judge Choy's February 20, 1997 order of support demonstrated a bias depriving Appellant of due process.

## VII.

Although Appellant noticed an appeal from the family court's May 22, 1997 oral order granting CSEA's motion for attorneys' fees, his opening brief did not list this as a point of error, and Appellant has not presented any argument on this issue. This court, therefore, will not address the matter. *Loui v. Board of Medical Examiners,* 78 Hawai'i 21, 29 n. 19, 889 P.2d 705, 713 n. 19 (1995); *Hall v. State,* 10 Haw.App. 210, 218, 863 P.2d 344, 348, *cert. denied,* 76 Hawai'i 246, 868 P.2d 464 (1993).

## VIII.

Based on the foregoing, we affirm the family court's May 28, 1997 judgment; the May 28, 1997 findings, conclusions, and order denying Appellant's motion to disqualify Judge Choy; the May 28, 1997 findings, conclusions, and order denying Appellant's motion to dismiss the petition; and the May 22, 1997 oral order granting CSEA's motion for attorneys' fees.

---

actions where a presumption of paternity as defined in [HRS § ] 584–4 exists, upon a motion by a party, the court shall order temporary support for the child *pending a judicial determination of parentage."* (Emphasis added.) This provision became effective June 21, 1997. 1997 Haw. Sess. L. Act 293 § 50, at 680.

**31.** At the May 5, 1995 hearing on Appellant's motion to disqualify Judge Choy, Judge Choy stated:

As to the question of prejudice regarding [Appellant's counsel's] assertion [that] this Court is dead set against [Appellant, o]ne must recognize the statutory bias against defendants after [a genetic] test is completed.

This case clearly showed [Appellant] is the father of [Child].

This Court had indicated to him the difficulty in overcoming such a test in this case and this has been set by statute.

Clearly, this Court is not expressing his personal bias. I'm merely informing of the statutory bias.

And, in fact, these cases[,] in [the] face of there being a testing[,] are very difficult to overcome.