52 P.3d 278

**Jane DOE, Petitioner–Appellant,**

v.

**John DOE and John Doe II, Respondents–Appellees.**

**No. 22172.**

Intermediate Court of Appeals of Hawai'i.

Feb. 22, 2001.

Certiorari Granted March 29, 2001.

**26**

Mark Van Pernis (Van Pernis, Smith & Vancil, of counsel), on the briefs, Kailua Kona, for Petitioner–Appellant.

Barry D. Edwards, on the briefs, Honolulu, for Respondent–Appellee John Doe.

Alan H. Tuhy, for Guardian Ad Litem.

BURNS, C.J., and WATANABE and LIM, JJ., dissenting.

OPINION OF THE COURT BY BURNS, C.J.

In this paternity case, the petitioners are the mother and her minor son. The respondents are the minor son's statutorily presumed father and the minor son's alleged father. The appellant is the minor son's mother.

In April 1987, Petitioner–Appellant Jane Doe (Mother) married Respondent–Appellee John Doe (Presumed Father). During their marriage, Mother gave birth to a daughter (Daughter) on October 4, 1988, and to a son (Son) on July 7, 1992. Mother and Presumed Father were divorced by a March 22, 1994 Divorce Decree (1994 Divorce Decree) that awarded Mother physical custody of Daughter and Son and child support from Presumed Father.

Two years later, on April 22, 1996, Mother filed a Petition for Paternity, Custody and Other Relief alleging that Respondent–Appellee John Doe II (Alleged Father) is Son's natural father.

In its March 18, 1998 Order on Plaintiff's Request for Genetic Testing Filed May 2, 1996, the court denied Mother's motion and Son's request for genetic testing on the basis that the 1994 Divorce Decree estops Mother from pursuing her paternity case and Son was in privity with Mother.

In its November 25, 1998 Decision/Judgment from Trial Held October 22, 1998, the family court decided that: (1) "[Mother] and/or [Son] . . . have not overcome the presumption of paternity previously established for [Son] to be with [Presumed Father]; and (2) "[Alleged Father] is not the natural father of [Son]."

We conclude that the 1994 Divorce Decree dissolving the marriage between Mother and Presumed Father does not estop or bar Mother from pursuing her paternity cause of action and that the family court violated the express and unequivocal mandate stated in Hawai'i Revised Statutes (HRS) § 584–11(a) (Supp.1996) and, in essence, as repeated in HRS § 584–12(4) (Supp.1996), that "[t]he court . . . upon request of a party shall, require the child, mother, or alleged father to submit to genetic tests, including blood tests." Consequently, we vacate the following:

1. The March 18, 1998 Order on Plaintiff's Request for Genetic Testing Filed May 2, 1996.

2. The July 29, 1998 Decision/Order on Plaintiff's Motion for Reconsideration of Court's Order on Plaintiff's Request for Genetic Testing Filed April 4, 1998.

3. The November 25, 1998 Decision/Judgment from Trial Held October 22, 1998.

4. The following of the March 25, 1999 Findings of Fact and Conclusions of Law: Findings of Fact (FsOF) nos. 4, 18, 23, 35, and 42; and Conclusions of Law (CsOL) D, G, H, K, L, M, N, Q, S, T, U, V, W, and X.

We remand for entry of an order granting Mother's May 2, 1996 Request for Genetic Testing pursuant to HRS § 584–11 and for further proceedings consistent with HRS Chapter 584 and this opinion.

BACKGROUND

In December 1993, in FC–D No. 93–0281K, Presumed Father filed a complaint for a divorce in which he alleged, in relevant part, that the parties have two children below age 18.

A December 10, 1993 (Stipulated) Order for Post/Pre Decree Relief awarded Mother

temporary physical custody of the children subject to Presumed Father's specified rights of visitation and ordered Presumed Father to pay Mother $1,645 per month "for family support" commencing December 1, 1993.

On February 3, 1994, Mother and Presumed Father filed their Marital Settlement and Child Custody Agreement (MSCCA). The MSCCA stated that Daughter and Son are "two children the issue of this marriage who are minors and require support[.]" The MSCCA agreed that Mother should be awarded physical custody of the children subject to joint legal custody and Presumed Father's specified visitation and payment of specified child support. The 1994 Divorce Decree approved and incorporated the MSCCA.

The parties returned to the family court on various occasions thereafter to resolve disputes, especially disputes pertaining to child support and visitation.

On April 22, 1996, Mother filed a Petition for Paternity, Custody and Other Relief alleging and asking that Alleged Father be declared the natural father of Son and asking for child support, visitation, costs, attorney fees, and genetic testing of Mother, Son, and Alleged Father.

On May 2, 1996, pursuant to HRS § 584–11, Mother filed a Request for Genetic Testing in which she asked that

she, [Son], and [Alleged Father] appear at a time and place prearranged by the parties for the purposes of identification in a qualified laboratory for the purpose of obtaining the blood specimen. Alternatively, in the event of the default of [Alleged Father], [Mother] will request that the same test and procedures be performed upon [Mother], [Son], and [Presumed Father].

On May 28, 1996, Presumed Father denied the allegation of Mother's petition, asserted that the relief requested was barred by the 1994 Divorce Decree, contended that "[t]he relief requested by [Mother] in the Petition is barred by estoppel, fraud, laches, res judicata, collateral estoppel, waiver, and other matter constituting an avoidance or affirmative defense[,]" and prayed

[t]hat the Court determine that (1) [Presumed Father] is the natural and legal father of [Son], (2) award [Presumed Father] custody of [Son], (3) order that [Mother] pay to [Presumed Father] child support in accordance with the applicable child support guidelines[,] and (4) award [Presumed Father] costs including reasonable attorney's fees for the defense of this action[.]

On June 3, 1996, Alleged Father denied the allegation of Mother's petition, denied the court's jurisdiction, and asserted that the relief requested was barred by the 1994 Divorce Decree and that Mother should be estopped from contradicting it.

On September 4, 1996, pursuant to HRS § 584–9(a) (Supp.1999), the court appointed a guardian ad litem (GAL) for Son. On September 11, 1996, the court added Son as a "party plaintiff."

On September 20, 1996, the court entered a restraining order enjoining all parties from discussing the issues in the case in the presence of Son and/or Daughter. The court made no provisions for the fact that Son was then a party plaintiff.

On March 14, 1997, the GAL filed his First Report of Guardian Ad Litem in which he opined, in relevant part, that "[i]t would be in the best interests of the children that blood testing be conducted ... at the convenience of the parties and the Court." The GAL further opined that "[t]he results of blood testing should be sealed by the Court, and released only in accordance with further recommendations made by the children's therapists in consultation with the GAL."

At the November 20, 1997 evidentiary hearing on Mother's May 2, 1996 Request for Genetic Testing, Mother testified that when Son was born, the two possible biological fathers were Presumed Father and Alleged Father. As Son got older, the similarities between Son and Alleged Father caused Mother to believe that Alleged Father was more likely the biological father. She further testified, in relevant part:

Q Why didn't you file this paternity action after you had married your attorney and the dispute starting happening con-

cerning custody and visitation at that point? Why didn't you file this paternity action then—two years ago?

A Just, uh, because it was still, you know, waiting and watching [Son] grow.

When asked why she did not do it sooner, she testified:

A Because I came from a very abusive relationship and I was fearful and I was extremely fearful for my son. I watched him [indiscernible] a window, being flung by his arm against the corner of a building that [indiscernible] and marked up his face. I had a restraining order. To get him out of the house, I had to hold onto him and I left with nothing and I went and filed a restraining order. I was scared to death and I was scared for my son if I revealed anything like that.

Q It's not then because between the— in the intervening time that you came to believe that [Alleged Father] having a 1.9 million piece of property might be a better source of child support? [1]

A No.

(Footnote added.)

The March 18, 1998 Order on Plaintiff's Request for Genetic Testing Filed May 2, 1996, states, in relevant part, as follows:

The basic issue before the Court is whether or not it is in the best interest of [Son] to order genetic testing of the parties to establish/disestablish paternity. The underlying issue is whether the presumption established by HRS § 584–4(a)(1) should be allowed to be rebutted. The Court has not found nor been directed to any Hawaii case law addressing these issues other than *Blackshire v. Blackshire*, 52 H. 480.

Necessarily involved issues are the burden and standard of proof. The Court concludes the involved presumption articulates a compelling public policy which imposes,

... the burden of proof on [Mother] and [Son], to establish by clear and convincing evidence that it is in the best interest of [Son] to order genetic testing (*see*, Hawaii Rules of Evidence, Rule 304 and commentary).

. . . .

... [T]he Court concludes [Mother] is estopped to pursue the paternity issue as against [Alleged Father]. It offends the notion of fair play that a party to multiple actions involving multiple requests, hearings and court orders establishing and accepting paternity as to one father, and all the while knowing there was a question of paternity, could now, when dissatisfied with the established father, seek to undo her creation. Such a situation appears to be what the doctrine of estoppel was designed to prevent.

The only other party seeking to change the status quo is [Son].... There is authority that a non-party child to a prior action where the issue paternity was or could have been litigated is not bound by any determination in such action based on a lack of privity.[2] It is difficult to understand how a parent and child could not be in privity for a divorce action determination as to the child's parentage, custody, visitation and support.... What closer identification, interest, bond could there be than a mother and child. [Mother] professes to be bringing the instant action in the best interest of [Son]. Did she not have that same best interest in mind when she negotiated and stipulated to the original decree for both children being of the parties to the marriage, for the custody and visitation and a support order exceeding the then Child Support Guidelines? ...

. . . .

For the reasons stated herein, the Court finds that [Mother] has failed to carry her burden of showing by clear and convincing

---

1. Finding of Fact no. 21 of the March 25, 1999 Findings of Fact and Conclusions of Law states, "Evidence was indirectly offered as to land assets of [Respondent–Appellee John Doe II], but no current market value or equity was established."

2. The authority to which the court is referring is *Hall v. Lalli*, 194 Ariz. 54, 977 P.2d 776 (1999).

It follows the general rule that a paternity adjudication in a divorce or annulment proceeding is not binding on a child who was not a party. Annotation, *Effect, in Subsequent Proceedings, of Paternity Findings or Implications in Divorce or Annulment Decree or in Support or Custody Order Made Incidental Thereto*, 78 A.L.R.3d 846 (1977).

evidence that genetic testing should be ordered and she has not overcome the presumption of paternity previously established for [Son] to be with [Father].

[Mother's] Motion for Request for Genetic Testing filed May 2, 1996, is denied with prejudice.

(Footnote added; citations omitted.) In plain language, the court decided that Mother is estopped from pursuing her paternity cause of action, and Son is barred because he is in privity with Mother.

The July 29, 1998 Decision/Order on Plaintiff's Motion for Reconsideration of Court's Order on Plaintiff's Request for Genetic Testing Filed April 4, 1998, states, in relevant part, as follows:

As to [Mother's] argument on HRS § 584–13(c), [Mother] omits a material provision of the cited section, namely that the mandate to order genetic testing is conditional on finding it is practicable; and the entire issue of whether a judicial declaration of the relationship (parent/child) is in the best interest of the child. Construing the provisions of the entire statute section, the Court concludes "practicable" is not confined to logistical issues but includes declining to order genetic testing where a finding has been made that such testing is not in the best interests of the child.

On November 25, 1998, the family court entered its Decision/Judgment from Trial Held October 22, 1998, in relevant part, as follows:

[T]here is ... no clear and convincing evidence that it is in [Son's] best interest to find in [Mother's] or [Son's] favor on genetic testing.

While the Court greatly appreciates the GAL's [Guardian Ad Litem's] interest and efforts on [Son's] behalf, the Court continues to respectfully disagree with the GAL's opinion that [Son's] interests will be served by pursuing this matter. The net result would be to disestablish paternity in the only father [Son] has known, and to establish paternity in a person who has

avowed to have no interest in [Son] in the past, present or future....

The Court concludes no party seeking affirmative relief has sustained their burden of establishing paternity in [Alleged Father]....

The Court therefore orders, adjudges and decrees as follows:

1) [Alleged Father] is not the natural father of [Son]....

....

3) Each party shall bear their own attorneys fees and costs.

4) [Mother] shall reimburse/pay the fees and costs of the GAL incurred in this matter[.]

On December 24, 1998, Mother filed a notice of appeal.

On January 20, 1999, the GAL filed a motion for instruction as to what further involvement, if any, he should take.[3] In the motion, the GAL stated that "the interests of [Son] may be adequately represented in the appeals process by counsel for [Mother]. However, should the Court believe that this is not the case, instructions to that extent are sought to assure that the purposes of the appointment have been adequately carried out by [GAL]."

In an order filed on February 26, 1999, the family court decided that

the [GAL], as representative of the best interests of the subject minor, has party status and instructions to the [GAL] could, in fact, affect the substantive actions taken by the Court and/or frustrate or interfere with the appeal; and, therefore, unless there is a remand to address the [GAL's] concerns, the Court determines it has no jurisdiction to entertain the [GAL's] motion.

On March 25, 1999, the family court entered its Findings of Fact and Conclusions of Law. The CsOL state, in relevant part, as follows:

D. The burden of proof is on [Mother] and [Son] to establish by clear and con-

---

**3.** The record does not explain why the guardian ad litem did not file a timely appeal on behalf of the son born on July 7, 1992, to Petitioner–Appellant Jane Doe (Mother).

vincing evidence that it is in the best interest of [Son] to order genetic testing.

. . . .

G. [Mother] is estopped to contest the issue of paternity and/or is prevented from raising the issue by reason of res judicata, subject to whether the best interests of [Son] warrant the application of estoppel against [Mother].

H. [Mother] is barred by the doctrine of res judicata as against [Alleged Father].

. . . .

K. A close family relationship with more may be enough to bind a non-party to a judgment.

L. Under the circumstances of this case, [Son] is bound by the prior judgment in the divorce decree establishing paternity in [Presumed Father].

M. The Court declines to give such weight or credit to Ms. James [4] opinion(s) that would justify a finding by clear and convincing evidence that genetic testing should be ordered in [Son's] best interests.

N. [Mother] and/or [Son] have failed to carry their burden of showing by clear and convincing evidence that genetic testing should be ordered and have not overcome the presumption of paternity previously established for [Son] to be with [Presumed Father].

. . . .

Q. The overall burden to show by clear and convincing evidence that testing is in [Son's] best interest is on [Mother] and/or [Son].

. . . .

S. Construing the provisions of the entire statute section, HRS § 584–13(c), "practicable" is not confined to logistical issues but includes declining to order genetic testing where a finding has been made that such testing is not in the best interests of the child.

T. There is no clear and convincing evidence that it is in [Son's] best interest to find in [Mother's] or [Son's] favor on genetic testing.

U. No party seeking affirmative relief has sustained their burden of establishing paternity in [Alleged Father] or disestablishing paternity in [Presumed Father].

V. [Alleged Father] is not the natural father of [Son] . . . .

W. There are no conflicting orders with respect to [Presumed Father] regarding the parentage of [Son] that need to be modified.

X. [Mother] is liable for reimbursement/payment of the GAL fees.

(Footnote added.)

In plain language, the court decided that Mother and Son are estopped from pursuing the paternity cause of action because the paternity cause of action is *res judicata*, and Son is in privity with Mother. The court also decided that Alleged Father is not the natural father of Son.

## MOTHER'S POINTS ON APPEAL

1. The family court reversibly erred when it refused to order genetic testing.

2. CsOL G and H are wrong and the family court reversibly erred in concluding that Mother is precluded from bringing the paternity action. Mother did not raise the paternity issue in the divorce case "because [Son] and [Alleged Father] were not parties to the prior action, nor was the issue of paternity raised and determined in the prior action."

3. COL L is wrong and the family court reversibly erred in ruling that Son was precluded from litigating the paternity issue. "[T]he issue was not determined, he was not a party to that action and he was not represented by a Guardian Ad Litem."

4. COL D is wrong and the family court reversibly "erred in concluding that the burden of proof is on Mother and [Son] to establish by clear and convincing evidence

---

4. Finding of Fact no. 17 of the March 25, 1999 Findings of Fact and Conclusions of Law states, "Three witnesses, Alan Tuhy, Terry Fujioka and Beverly James, testified their opinion was that

genetic testing and/or paternity should be allowed/established for a variety of reasons, and to be disclosed to [Son] at a variety of times."

that it is in the best interests of [Son] to order genetic testing."

5. The family court reversibly erred in failing to find that it is in Son's best interests that genetic testing be done to establish paternity.

Presumed Father declines to participate in this appeal. Alleged Father asks for an affirmance of the family court's orders and decrees.

The GAL's position in the family court and in an answering brief filed in this appeal is "to allow the genetic testing and **then** determine what was the best course to take on the test results." (Emphasis in original.)

### RELEVANT STATUTES

Prior to 1975, paternity actions were governed by HRS Chapter 579 (1968). HRS § 579-1 (1968) states, in relevant part, as follows:

> **Petition against alleged father; time limit; preliminary examination.** Any unmarried woman or any married woman who was separated from and was not living with her husband prior to and at the time her child was conceived, ... within two years after the delivery of her child, may petition the judge of the family court ... for an adjudication of paternity and for other relief under this chapter against the person whom she alleges is the father of the child.
>
> The petition may also be filed by either of the parents or a guardian of the mother, or by any person as the next friend of the child, or by any public officer or employee concerned with the welfare of the child, within two years after the date of the child's birth.

HRS Chapter 584 (1993 and Supp.1999) is Hawai'i's Uniform Parentage Act. It was first enacted in 1975. In the following quotations of the relevant statutes, if the statute has not been amended post–1993, we will cite the HRS (1993). If the statute quoted includes a post–1993 amendment, we will cite the HRS (Supp.1997). This is because the March 18, 1998 Order on Plaintiff's Request for Genetic Testing Filed May 2, 1996 was preceded by hearings on November 20, 1997, November 21, 1997, and January 15, 1998. If the statute quoted has been amended post–1997, we will note the amendment in a footnote.

HRS § 584-4 (Supp.1997) states, in relevant part, as follows:

> **Presumption of paternity.** (a) A man is presumed to be the natural father of a child if:
>
> (1) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within three hundred days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a decree of separation is entered by a court;
>
> . . . .
>
> (5) Pursuant to section 584-11, he submits to court ordered genetic testing and the results, as stated in a report prepared by the testing laboratory, do not exclude the possibility of his paternity of the child; provided the testing used has a power of exclusion greater than 99.0 per cent and a minimum combined paternity index of five hundred to one; or
>
> . . . .
>
> (b) A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence. If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing paternity of the child by another man.

HRS § 584-6 (1993) states, in relevant part, as follows:

> **Determination of father and child relationship; who may bring action; when action may be brought; process, warrant, bond, etc.** (a) A child, or guardian ad litem of the child, the child's natural mother, whether married or unmarried at the time the child was conceived, or her personal representative or parent if the mother has died; or a man alleged or alleging himself to be the natural father, or his personal representative or parent if the

father has died; or a presumed father as defined in section 584–4, or his personal representative or parent if the presumed father has died; or the child support enforcement agency, may bring an action for the purpose of declaring the existence or nonexistence of the father and child relationship within the following time periods:

. . . .

    (2) If the child has not become the subject of an adoption proceeding, within three years after the child reaches the age of majority; provided ·that any period of time during which the man alleged or alleging himself to be the natural father of the child is absent from the State or is openly cohabitating with the mother of the child or is contributing to the support of the child, shall not be computed.

. . . .

    (c) Regardless of its terms, an agreement, other than an agreement approved by the court in accordance with section 584–13(b), between the alleged or presumed father and the mother or child, shall not bar an action under this section.

HRS § 584–8(a) (Supp.1997) states, in relevant part, as follows: "Without limiting the jurisdiction of any other court, the family court has jurisdiction of an action brought under this chapter. The action may be joined with an action for divorce, annulment, separate maintenance, or support."

HRS § 584–11 (Supp.1997) states, in relevant part, as follows:

    **Genetic tests.** (a) The court may, and upon request of a party, shall, require the child, mother, or alleged father to submit to genetic tests, including blood tests. If the requesting party is the mother or the alleged father, the court shall require that the request be made pursuant to a sworn statement. The sworn statement made by the party must either:

    (1) Allege paternity setting forth facts establishing a reasonable possibility of the requisite sexual contact between the parties; or

    (2) Deny paternity setting forth facts establishing a reasonable possibility of the non-existence of sexual contact between the parties. The testing utilized must have a power of exclusion greater than ninety-nine point zero per cent (99.0%) and a minimum combined paternity index of five hundred to one, and shall be performed by an expert qualified as an examiner of genetic markers, appointed by the court. . . .

    (b) The court, upon reasonable request by a party, shall order that independent tests be performed by other experts qualified as examiners of genetic markers.

    (c) In all cases, the court shall determine the number and qualifications of the experts.

    (d) "Genetic test" means the testing of inherited or genetic characteristics (genetic markers) and includes blood testing for paternity purposes.

    (e) In any trial brought under this chapter, a report of the facts and results of genetic tests ordered by the court under this chapter shall be admissible in evidence by affidavit of the person whose name is signed to the report, attesting to the procedures followed in obtaining the report. A report of the facts and results of genetic tests shall be admissible as evidence of paternity without the need for foundation testimony or other proof of authenticity or accuracy, unless objection is made. The genetic testing performed shall be of a type generally acknowledged as reliable by accreditation bodies designated by the United States Secretary of Health and Human Services. An alleged parent or party to the paternity action who objects to the admission of the report concerning the genetic test results must file a motion no later than twenty days after receiving a copy of the report and shall show good cause as to why a witness is necessary to lay the foundation for the admission of the report as evidence. The court may, sua sponte, or at a hearing on the motion determine whether a witness shall be required to lay the foundation for the admission of the report as evidence. The right to call witnesses to rebut the report is reserved to all parties.

HRS § 584–12 (Supp.1997) (prior to Act 153 effective July 7, 1998 [5]) states, in relevant part, as follows:

**Evidence relating to paternity.** Evidence relating to paternity may include:

. . . .

(3) Genetic test results, including blood test results, weighted in accordance with evidence, if available, of the statistical probability of the alleged father's paternity;

(4) Medical or anthropological evidence relating to the alleged father's paternity of the child based on tests performed by experts. If a man has been identified as a possible father of the child, the court may, and upon request of a party shall, require the child, the mother, and the man to submit to appropriate tests;

(5) A voluntary, written acknowledgment of paternity that shall create a rebuttable presumption of paternity; and

(6) All other evidence relevant to the issue of paternity of the child.

HRS § 584–13 (1993) states, in relevant part, as follows:

**Pretrial recommendations.** (a) On the basis of the information produced at the pre-trial hearing, the judge conducting the hearing shall evaluate the probability of determining the existence or nonexistence of the father and child relationship in a trial and whether a judicial declaration of the relationship would be in the best interest of the child. On the basis of the evaluation, an appropriate recommendation for settlement shall be made to the parties, which may include any of the following:

(1) That the action be dismissed with or without prejudice;

(2) That the matter be compromised by an agreement among the alleged father, the mother, and the child, in which the father and child relationship is not determined but in which a defined economic obligation is undertaken by the alleged father in favor of the child and, if appropriate, in favor of the mother, subject to approval by the judge conducting the hearing. In reviewing the obligation undertaken by the alleged father in a compromise agreement, the judge conducting the hearing shall consider the best interest of the child, in the light of the factors enumerated in section 576D–7 [pertaining to "[g]uidelines in establishing amount of child support"], discounted by the improbability, as it appears to him, of establishing the alleged father's paternity or nonpaternity of the child in a trial of the action. In the best interest of the child, the court may order that the alleged father's identity be kept confidential. In that case, the court may designate a person or agency to receive from the alleged father and disburse on behalf of the child all amounts paid by the alleged father in fulfillment of obligations imposed on him; or

(3) That the alleged father voluntarily acknowledge his paternity of the child.

. . . .

(b) If the parties accept a recommendation made in accordance with subsection (a), judgment shall be entered accordingly.

(c) If a party refuses to accept a recommendation made under subsection (a) and genetic tests, including blood tests have not been taken, the court shall require the parties to submit to genetic tests, if practicable. Thereafter the judge shall make an appropriate final recommendation. If a party refuses to accept the final recommendation, the action shall be set for trial.

(d) The guardian ad litem may accept or refuse to accept a recommendation under this section.

(e) The informal hearing may be terminated and the action set for trial if the judge conducting the hearing finds it unlikely that all parties would accept a recommendation he might make under subsection (a) or (c).

---

5. Act 153, effective July 7, 1998, deleted from the end of paragraph (5) the words "that shall create a rebuttable presumption of paternity; and," added a paragraph (6), and redesignated the former paragraph (6) as paragraph (7).

HRS § 584–14(a) (1993) states, in relevant part, as follows: "An action under this chapter shall be a civil action governed by the Hawaii Rules of Civil Procedure or the Hawaii Family Court Rules."

HRS § 580–47(a) (Supp.1997) states, in relevant part, as follows:

> Upon granting a divorce, or thereafter if, in addition to the powers granted in subsections (c) and (d) [to revise child support orders], jurisdiction of those matters is reserved under the decree by agreement of both parties or by order of court after finding that good cause exists, the court may make any further orders as shall appear just and equitable (1) compelling the parties or either of them to provide for the support, maintenance, and education of the children of the parties; (2) compelling either party to provide for the support and maintenance of the other party; (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate; and (4) allocating, as between the parties, the responsibility for the payment of the debts of the parties whether community, joint, or separate, and the attorney's fees, costs, and expenses incurred by each party by reason of the divorce.

## DISCUSSION

The family court concluded that the basic issue was whether it was in Son's best interests to allow the HRS § 584–4(a)(1) statutory presumption of paternity to be rebutted by a genetic test. It answered that question in the negative. The basis of the family court's decision is stated in FOF no. 42 as follows: "To disestablish paternity in the only father [Son] has known, and to establish paternity in a person who has avowed to have no interest in [Son] in the past, present or future would not be in [Son's] interest."

All of the other of the family court's decisions facilitated its decision in FOF no. 42. These other decisions are as follows: (1) Mother's and Son's request for a genetic test is denied; (2) Mother is equitably estopped from contradicting Presumed Father's paternity because of what she did and did not do in and with respect to the divorce case; (3)

as a result of the 1994 Divorce Decree, the paternity issue is *res judicata* as to both Mother and Son; and (4) Mother has failed to carry her burden of overcoming the HRS § 584–4(a)(1) statutory presumption of paternity.

For the following reasons, we conclude that the family court reversibly erred.

First, we conclude that the family court violated the express and unequivocal mandate stated in HRS § 584–11(a) that "[t]he court ... upon request of a party shall, require the child, mother, or alleged father to submit to genetic tests" and the similar mandate in HRS § 584–12(4). As stated by this court in *Child Support Enforcement Agency v. Doe*, 88 Hawai'i 159, 174, 963 P.2d 1135, 1150 (App.1998):

> We also disagree with Appellant's contention that genetic tests are not mandatory. HRS § 584–11 provides, in pertinent part, for genetic tests: "(a) The court may, and upon the request of a party *shall*, require the child, mother, or alleged father to submit to genetic tests, including blood tests." (Emphasis added.) Because genetic testing is mandatory when requested by a party, the statute does not confer discretion on the family court to consider the best interest of the child before ordering such tests.

We further conclude that the family court was wrong when it concluded that HRS § 584–13(c) modifies the unequivocal mandates of HRS §§ 584–11(a) and –12(4). HRS § 584–13 authorizes the court to recommend a pretrial compromise settlement which considers "the best interests of the child." This consideration of the "best interest of the child" and recommendation for settlement should occur after the "genetic tests, including blood tests" permitted/mandated by HRS § 584–11(a) and the "appropriate tests" permitted/mandated by HRS § 584–12(4). If this recommendation for settlement occurs before the "genetic tests, including blood tests," and a party refuses to accept the recommendation for settlement, HRS § 584–13(c) specifies that "the court shall require the parties to submit to genetic tests, if practicable." We disagree with the family

court's definition in its March 25, 1999 Conclusion of Law S of the word "practicable." We define it as "[c]apable of being . . . done." The American Heritage Dictionary of the English Language 1028 (1969).

In our view, the family court: (1) erred when it imposed rather than recommended its HRS § 584–13 pretrial recommendation; and (2) violated HRS §§ 584–11 and –12 when it denied Mother's motion for genetic tests. The family court's statutory duty to order genetic tests does not involve any consideration of "the best interests of the child." The only time the consideration of "the best interests of the child," HRS § 584–13(a), is relevant is when the family court is deciding "an appropriate recommendation for settlement," HRS § 584–13(a), to be made to the parties. If the recommended settlement is rejected, the case goes to trial. HRS § 584–13(c). "In any trial brought under [HRS Chapter 584], a report of the facts and results of genetic tests ordered by the court under this chapter shall be admissible in evidence[.]" HRS § 584–11(e).

Second, we disagree with the family court's view that Son's interests will not be served by pursuing this matter. It is not unusual for Alleged Father to want not to be involved. We repeat and reaffirm the policy, based on HRS Chapter 584 and other relevant considerations, that "[a] presumptively legitimate child of questionable parentage should know the truth of her [or his] parentage—both, if there is a difference, her [or his] natural and her [or his] legal parentage." *Doe v. Roe*, 9 Haw.App. 623, 626–27, 859 P.2d 922, 924 (1993). This is the policy of HRS Chapter 584, Hawai'i's Uniform Parentage Act. This policy supersedes all of the equitable estoppel considerations asserted by Presumed Father and the family court.

Third, we conclude that as compared to the presumption based on HRS § 584–4(a)(1) (presumption of paternity based on marital status), the presumption based on HRS § 584–4(a)(5) (presumption of paternity

based on genetic testing) is "the presumption which on the facts is founded on the weightier considerations of policy and logic" and, therefore, it "controls." HRS § 584–4(b).

Fourth, Mother's participation in the MSCCA and other agreements with Presumed Father is not a basis for equitably estopping her from pursuing her petition in this case. HRS § 584–6(c) expressly states that "[r]egardless of its terms, an agreement, other than an agreement approved by the court in accordance with section 584–13(b), between the alleged or presumed father and the mother or child, shall not bar an action under this section."

Fifth, we conclude that the family court erroneously applied the "claim preclusion" and "issue preclusion" rules.

The Hawai'i Supreme Court has stated that

[a]lthough this court has stated that the doctrine of *res judicata* involves two aspects—claim preclusion and issue preclusion—each aspect, in practice, involves distinct questions of law.

Specifically, claim preclusion prohibits a party from relitigating a previously adjudicated cause of action. Issue preclusion, or collateral estoppel, on the other hand, applies to a subsequent suit between the parties or their privies on a *different* cause of action and prevents the parties or their privies from relitigating *any issue* that was actually litigated and finally decided in the earlier action.

*Dorrance v. Lee*, 90 Hawai'i 143, 148–49, 976 P.2d 904, 909 (1999) (emphases in original).

In the instant case, there is no collateral estoppel/issue preclusion. The issue of paternity was not and could not have been contested, litigated, and/or determined in the divorce cause of action. The family court's authority in a divorce cause of action does not include the authority to adjudicate questions of paternity.[6] The issue of paterni-

---

6. In contrast, in Hawai'i's Uniform Reciprocal Enforcement of Support Act, Hawai'i Revised Statutes (HRS) § 576–39.5 (1993) states as follows:

**Paternity.** If the obligor asserts as a defense that the obligor is not the father of the child for whom support is sought and it appears to the court that the defense is not frivolous, and if both the child's alleged father and the child's

ty could have been, but was not, contested, litigated, and/or determined in a paternity action, and that paternity action could have been, but was not, joined with the divorce action.

The question is whether there is claim preclusion. The first "cause of action" was a divorce action. Does the 1994 Divorce Decree and the claim preclusion rule bar the paternity cause of action? More plainly stated, is Mother barred from pursuing her paternity action now because she did not join a paternity action with her divorce action? Our answer is no.

The permission to join a paternity cause of action with a divorce cause of action is statutory. If, at the time of the divorce action, a party questions paternity, HRS § 584-8(a) states that "[t]he [paternity] action may be joined with an action for divorce[.]" In other words, a paternity action under HRS Chapter 584, Hawai'i's Uniform Parentage Act, and a divorce action under HRS Chapter 580 "may" be joined together. This statute confirms that paternity actions and divorce actions are separate and distinct causes of action.

The first sentence of HRS § 571–47 (1993) states that

> [w]henever, in any action involving the custody or support of a child apparently born in lawful wedlock, the legitimacy of the child is placed in issue, the court may make the child a party to the action, if not already a party, and shall thereupon determine the legitimacy of the child as one of the issues in the action.

Like HRS § 584-8(a), HRS § 571–47 permits, but does not require, the joinder of a paternity action under HRS Chapter 584, Hawai'i's Uniform Parentage Act, with an action involving child custody/support.[7]

No statute authorizes the family court to refuse compliance with the mandates of HRS Chapter 584 on the ground that Mother,

when she was a party in a divorce action, did not dispute Presumed Father's presumed paternity and have a paternity action joined with the divorce action.

The dissent states that *Blackshear v. Blackshear*, 52 Haw. 480, 478 P.2d 852 (1971), is "directly on point and dispositive in this case." We disagree. When *Blackshear* was decided, paternity actions could not be brought (a) by a mother living with her husband prior to and at the time her child was conceived, (b) by a mother's husband, or (c) after two years after the child was born. HRS § 332–1 (1955). In *Blackshear*, the divorce decree was entered in 1964. In the latter part of 1967, the divorced former husband sought a modification of the child support payments and "sought to deny his parentage of two of the four minor children involved in this case." *Id.* at 480, 478 P.2d at 853. "The matter of legitimacy was found to be res judicata" by the family court. *Id.* at 481, 478 P.2d at 853. In its opinion, the Hawai'i Supreme Court stated that "[a]ppellant's position as to their [two of the four minor children's] parentage is without merit, this issue having been finally adjudicated below." *Id.* The court did not explain its statement. In light of HRS § 332–1 (1955), claim preclusion is not the only reasonable interpretation.

More significantly, the relevant law relating to paternity actions has changed since *Blackshear* was filed. HRS Chapter 584, Hawai'i's Uniform Parentage Act, became law in 1975. HRS § 584–6 (1993) permits "the child's natural mother, whether married or unmarried at the time the child was conceived," to bring a paternity action "within three years after the child reaches the age of majority[.]"

In contrast, HRS §§ 580–41 through 580–56 (Supp.1999) authorize divorce actions. They authorize the family court to enter divorce decrees, order spousal support,

---

mother are present at the hearing or the proof required in the case indicates that the presence of either or both of then is not necessary, the court may adjudicate the paternity issue. Otherwise, the court may adjourn the hearing until the paternity issue has been adjudicated.

7. When the court adjudicates the paternity issue, the case must be labeled as a paternity case in addition to the label already assigned to the case and all parties must have notice of the paternity case being adjudicated. The adjudication of the paternity case must be in accordance with HRS Chapter 584, Hawai'i's Uniform Parentage Act.

award custody/visitation of children, order child support, divide/distribute the estate of the parties, and allocate the responsibility for the payment of the debts of the parties and the attorney fees, costs, and expenses incurred by each party by reason of the divorce. They do not authorize paternity decisions within the divorce action. With respect to a child or children, divorce cases proceed on the basis of the presumed father's presumed paternity of the child or children under HRS § 584–4 (Supp.1999).

As noted above, "claim preclusion prohibits a party from relitigating a previously adjudicated cause of action." *Dorrance, supra.* But the divorce cause of action does not involve paternity issues and is a separate and distinct cause of action from the paternity cause of action. Although the two causes of action could have been joined,[8] they were not required to be joined. Therefore, a previously adjudicated divorce cause of action awarding child custody/support does not bar a subsequent paternity cause of action regarding the child/children involved in the child custody/support order(s).

In our view, the precedent in other states that a finding or implication of paternity in a divorce or annulment decree, or in an incidental support or custody order, bars the parties from thereafter challenging paternity, Annotation, *Effect, in Subsequent Proceedings, of Paternity Findings or Implications in Divorce or Annulment Decree or in Support or Custody Order Made Incidental Thereto,* 78 A.L.R.3d 846 (1977), is contrary to Hawai'i's law. In Hawai'i, paternity issues cannot be adjudicated in divorce actions, paternity issues can be adjudicated only in paternity actions, and paternity actions may be, but are not required to be, joined with divorce actions. A divorce decree is no exception to the provision in HRS § 584–6(a)(2) that "the child's natural mother, ... may bring an action for the purpose of declaring the existence or nonexistence of the father

and the child relationship ... within three years after the child reaches the age of majority[.]" We agree with the minority precedent of *Shell v. Law,* 935 S.W.2d 402 (Tenn. App.1996) (no *res judicata* because the parties are not the same, and no judicial estoppel because, at the time of the divorce hearing, the parties were unaware of the true facts relating to paternity of the child in that DNA tests had not been performed), and *Guilford County v. Davis,* 123 N.C.App. 527, 473 S.E.2d 640 (1996) (alleged father may not rely on the divorce decree as an adjudication of presumed father as the biological father of the child because the divorce decree merely relies upon the presumption of legitimacy).

Sixth, it being the law, as stated in HRS § 584–6(c), that "an agreement, other than an agreement approved by the court in accordance with section 584–13(b), between the alleged or presumed father and the mother or child, shall not bar" a paternity action, it is not logical or reasonable that a divorce decree that is based on an agreement not approved by the court in accordance with HRS § 584–13(b) and a divorce case in which the issue of paternity was not contested or litigated, shall bar a subsequent paternity action.

Seventh, assuming the mother knew or should have known at the time of the divorce that the presumed father was not the biological father and harmed or damaged the presumed father and/or the biological father by her concealment, the law should deal with those matters in ways that punish the mother and benefit the injured party or parties. It should not deal with them by refusing to comply with HRS §§ 584–11(a) and –12(4) by barring simple and reliable blood tests that would accurately determine the issue of paternity.

## CONCLUSION

Accordingly, we conclude that CsOL D, G, H, L, M, N, Q, and S are wrong, COL K is

---

**8.** In this opinion, we do not discuss the way or ways in which a paternity cause of action can be "joined with" a filed but not finally decided divorce case. We conclude, however, that when paternity is contested in a divorce case, a paternity case must be "joined with" the divorce case, all parties must have notice of the paternity case

being adjudicated, and the paternity case must be adjudicated in accordance with HRS Chapter 584, Hawai'i's Uniform Parentage Act. However this may be done, it was not done with respect to the divorce case between Mother and Respondent–Appellee John Doe that was finally decided by the March 22, 1994 Divorce Decree.

too general, COL T is irrelevant, and CsOL U, V, W, and X are premature.

We vacate the following:

1. The March 18, 1998 Order on Plaintiff's Request for Genetic Testing Filed May 2, 1996.

2. The July 29, 1998 Decision/Order on Plaintiff's Motion for Reconsideration of Court's Order on Plaintiff's Request for Genetic Testing Filed April 4, 1998.

3. The November 25, 1998 Decision/Judgment from Trial Held October 22, 1998.

4. The following of the March 25, 1999 Findings of Fact and Conclusions of Law: FsOF nos. 4, 18, 23, 35, and 42, and CsOL D, G, H, K, L, M, N, Q, S, T, U, V, W, and X.

We remand for entry of an order granting Mother's May 2, 1996 Request for Genetic Testing pursuant to HRS § 584–11, and for further proceedings consistent with HRS Chapter 584 and this opinion.

## DISSENTING OPINION OF LIM, J.

In *Blackshear v. Blackshear*, 52 Haw. 480, 478 P.2d 852 (1971), the appellant filed in the lower court certain motions by which he sought to modify the amount of child support owing on account of the four minor children decreed to be his in a divorce granted some three years before. In the motions, appellant also sought to deny his paternity of two of the four. *Id.* at 480, 478 P.2d at 853.

The divorce decree had incorporated an agreement between the appellant and the appellee, the former Mrs. Blackshear, that had been approved by the decreeing court and filed in the divorce action. The agreement specified the amount of child support to be paid by the appellant for the support of "the four minor children of the marriage[,]" designating each child by name. *Id.* at 481, 478 P.2d at 853.

In denying the motions, the lower court found the issue of paternity to be *res judicata.* On appeal, the Hawai'i Supreme Court affirmed that conclusion, holding that "[a]ppellant's position as to their parentage is without merit, this issue having been finally adjudicated below." *Id.*

I believe *Blackshear* is directly on point and dispositive in this case. When the divorce court approved and its decree incorpo-

rated the MSCCA entered into by Mother and Presumed Father, the question of the paternity of Son was rendered *res judicata* as to the parties to the divorce, including Mother, who nevertheless brings this petition, more than two years later, questioning the paternity of Son.

The overarching and superseding justification for the majority's holding, that "[a] presumptively legitimate child of questionable parentage should know the truth of her parentage—both, if there is a difference, her natural and her legal parentage[,]" taken from *Doe v. Roe*, 9 Haw.App. 623, 626–27, 859 P.2d 922, 924 (1993)(internal quotation marks omitted), is taken from questionable context as *Doe* was a case in which the infant's parentage was being litigated, for the first time, in parallel divorce and paternity actions but was not yet adjudicated in either. *Id.* at 623–24, 859 P.2d at 923.

Surely, such a child should know and have her parentage judicially and finally determined. Vital issues may then be addressed and permanently adjudicated concerning responsibility for the care, shelter, support, guidance, nurture and—lest I neglect to mention it—love of the child.

In this case, on the other hand, Son's parentage was, per *Blackshear*, finally adjudicated in the prior divorce action. From his birth, and for at least six years since entry of the divorce decree, the accretions of the heart have bound Presumed Father and this boy, still just eight years old, pursuant to that final adjudication. We now propose to expose these most cherished ties to the imperious and unsentimental vagaries of the altar of knowledge. This appears to be the majority's only mission because the Alleged Father "has avowed to have no interest in [Son] in the past, present or future[.]" I must confess I lack the pioneering courage to fully embrace this particularly brave new world.

Implicit in the majority's conclusion is the notion that the legislature, in promulgating HRS chapter 584, implicitly overruled the supreme court's holding in *Blackshear*.

Though concise and unadorned by lengthy justification, the holding in *Blackshear* nonetheless embodies, at least in my view, a fundamental preference for stability over

knowledge, for the ties the heart of a child develops over the brute fact of blood, that obtains when the welfare of the child is at stake. It is perhaps because of this foundation that the laconic holding in *Blackshear* goes without having to say much.

If the legislature indeed intended to undermine this foundation with its passage of HRS chapter 584, one would expect at least some such discussion, at the very least some such mention, in the chapter's legislative history:

> The Uniform Parentage Act, promulgated and adopted by the National Conference of Commissioners on Uniform State Laws in 1973 and approved by the House of Delegates of the American Bar Association in 1974, is intended to provide substantive legal equality for all children regardless of the marital status of their parents. The Uniform Act is designed to meet the constitutional equality standards enunciated by the United States Supreme Court in two lines of decisions, one beginning with *Levy v. Louisiana,* 391 U.S. 68 [88 S.Ct. 1509, 20 L.Ed.2d 436](1968), dealing with the substantive rights of the child born out of wedlock; and the other beginning with *Stanley v. Illinois,* 405 U.S. 645 [92 S.Ct. 1208, 31 L.Ed.2d 551] (1972), dealing with the rights of the father of a child born out of wedlock."

Hse. Stand. Comm. Rep. No. 136, in 1975 House Journal, at 980–81.

*Levy v. Louisiana,* 391 U.S. 68, 72, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), reversed on equal protection grounds an interpretation of a Louisiana law which barred illegitimate children from recovering for the wrongful death of their natural and nurturant mother. *Stanley v. Illinois,* 405 U.S. 645, 658, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), invalidated on the same grounds an Illinois law by which the state took custody of illegitimate children from their natural father, upon the death of their natural mother, without a hearing to determine his fitness to have custody of them.

Clearly, the legislature passed HRS chapter 584 in order to ensure that illegitimate children enjoy the rights and protections that adjudicated parentage affords. Hence the chapter has no application to a case like this one, in which the divorce decree adjudicating

Son's parentage has already afforded him the rights and protections the chapter is meant to confer.

There is no indication that the legislature promulgated the chapter to rectify, on behalf of the confessing party, admittedly false divorce pleadings, no matter how sympathetic the circumstances which gave rise to the omission. Nor is there any indication that the legislature intended the law as a vehicle for "father shopping." And there is not a scintilla of evidence in the legislative history that the law was meant to foster a search for one's paternity in the service of knowledge for knowledge's sake.

At least one annotator concludes that it is well nigh universally accepted among the jurisdictions that an adjudication of paternity in a prior divorce proceeding is conclusive upon its parties in a later paternity proceeding:

> Specifically, in almost every case considering the effect, in subsequent proceedings between a husband and wife, of a finding or implication of paternity in a divorce or annulment decree, or in an incidental support or custody order, the courts have held or recognized that a husband and wife are concluded by the prior paternity determination.

Donald M. Zupanec, Annotation, *Effect, in Subsequent Proceedings, of Paternity Findings or Implications in Divorce or Annulment Decree or in Support or Custody Order Made Incidental Thereto,* 78 A.L.R.3d 846, 851 (1977)(footnote omitted).

A merely cursory review of such cases uncovers several directly on point, and reveals the principles and cogent considerations underlying the majority rule.

In *In re Marriage of Klebs,* 196 Ill.App.3d 472, 143 Ill.Dec. 363, 554 N.E.2d 298 (1990), wife filed for divorce and a contest for custody of her daughter born during the marriage ensued. Some two years later, a judgment for dissolution of marriage was issued incorporating an agreed order granting the parties joint custody of the daughter while maintaining her physical residence with the husband. The judgment stated that the daughter had been born to the marriage. Soon after, the wife remarried. *Id.* at 301.

About six months after the divorce, the wife filed a petition for determination of the paternity of her daughter. The wife also sought to vacate the portions of the divorce judgment establishing her former husband's paternity and granting him joint legal and full physical custody. The wife's petition revealed that blood tests taken about a month before the filing of her petition rather conclusively established that her current husband, and not her former husband, was the natural father of her daughter. *Id.*

The trial court ordered the former husband to undergo similar blood tests, which yielded much the same result. At an evidentiary hearing, the wife admitted that at the time she filed the divorce petition, she had already begun to suspect that her daughter was not the issue of her former husband because she bore a physical resemblance to her current husband instead. *Id.* at 302.

The trial court vacated the divorce judgment insofar as it found paternity in the former husband. The trial court held that "it was in [the daughter's] best interest to recognize that she had two fathers." The trial court further held that the current husband was "the biological father" but that the former husband was "the 'equitable' or 'psychological' father[.]" The trial court did not, however, disturb the custody arrangements established in the divorce judgment. *Id.*

On appeal, the Appellate Court of Illinois held that the trial court erred in ordering the former husband to submit to blood tests and in not dismissing the wife's petition. As to the latter error, the appellate court stated, *inter alia,* that:

> Certainly, the petitioner in this case was a party to the dissolution proceedings. Therefore, she may be estopped from raising the issue of [her daughter's] parentage and the finding of paternity, as set forth in the dissolution decree, may be held *res judicata* for the purposes of her post-decree petition.

*Id.* at 303.

Similarly, in *Markert v. Behm,* 394 N.W.2d 239 (Minn.Ct.App.1986), wife alleged in her petition for divorce that her husband was the father of her daughter born during the marriage. Over the course of the divorce proceedings, she reiterated that assertion in an affidavit, in a stipulation and in testimony. She asked for custody of her daughter subject to the husband's rights of visitation and for child support from the husband for her daughter's care and maintenance. The final decree of divorce declared daughter to be the child of husband and wife. *Id.* at 240–41.

About eight months later, the wife commenced a paternity action, seeking a declaration that an alleged father, and not her former husband, was the natural father of her daughter. She also requested a court order compelling the parties to submit to blood tests. Later the wife added a request that her daughter be joined as co-plaintiff and that a guardian ad litem be appointed by the court to represent her. *Id.* at 241.

The trial court held that the wife was estopped from bringing a paternity action by the previous divorce decree. The trial court did not rule on the wife's motion to add her daughter as co-plaintiff or her request for appointment of a guardian ad litem. On appeal, the Court of Appeals of Minnesota affirmed, holding that "the doctrines of collateral estoppel, equitable estoppel, and res judicata all bar[red]" the wife's paternity action. *Id.*

With respect to estoppel, the court of appeals reasoned, "Now that [wife] has succeeded in having [husband] named as [daughter's] father for the purpose of collecting child support, she challenges his paternity, in direct contradiction to her own prior testimony. Clearly, [wife] would be both collaterally and equitably estopped from challenging this adjudication because it was based on her own testimony." *Id.* at 242.

The court of appeals also noted that "paternity was clearly placed in issue by the pleadings in the dissolution action and ... the finding of fact that the children are the minor children of [husband] is res judicata and bars further litigation of the issue in the paternity action." *Id.* (internal quotation marks and citations omitted).

Again, in *Ghrist v. Fricks,* 219 Ga.App. 415, 465 S.E.2d 501 (1995), wife and her husband had a son born during the marriage. The husband was listed as the father on the son's birth certificate. The husband related to the son as a father does, and a father-and-

son bond developed between them. Unbeknownst to the husband, however, his wife had been carrying on an affair with an alleged father beginning a few months into the marriage and continuing through and after the period of her son's conception. The wife first suspected that the alleged father was the natural father of her son shortly after discovering she was pregnant. *Id.* at 503, 505.

Almost two years after her son's birth, the wife filed for divorce. In her divorce complaint, the wife alleged that her husband was the natural father of her son. About a month later, the wife and the husband entered into a settlement agreement which referred to her son as their minor child and laid out the husband's visitations rights and child support responsibilities. About another month later, the divorce court entered a final judgment and decree of divorce which expressly incorporated the settlement agreement. *Id.*

About three months after the divorce became final, the wife and the alleged father married. Eight months after their marriage, they had blood tests performed which confirmed the alleged father's paternity. They then filed a paternity action to determine the alleged father's paternity, and to relieve the former husband of his child support obligations and divest him of his parental rights. Over the former husband's objection, the trial court ordered him to submit to a blood test, which excluded any possibility that he was the natural father of the son. *Id.*

Following a jury trial, the trial court entered a judgment declaring the alleged father to be the son's legal and biological father, relieving the former husband of his child support obligations and divesting him of his parental rights. *Id.* at 504.

The Court of Appeals of Georgia reversed, holding that the wife and the alleged father were collaterally estopped from bringing the paternity action by the previous divorce judgment and their actions and positions therein. In so holding, the court of appeals remarked that "[t]his court cannot in good conscience permit [wife and alleged father] to now deny that [the former husband] is the child's father and to sever all ties the child has with his legal father." *Id.* at 505.

Even if a paternity action is brought by the state on behalf of a mother under similar circumstances, the result remains the same. In *State ex rel. Henderson v. Tolver,* 639 So.2d 1371 (Ala.Civ.App.1994), the State of Alabama sought a paternity determination and child support from the alleged father on behalf of a mother of twin daughters. The Court of Civil Appeals of Alabama affirmed dismissals by the district court and by the circuit court on a request for trial de novo because a previous judgment of divorce barred the paternity action on the grounds of *res judicata. Id.* at 1372.

Rejecting the state's argument that the judgment of divorce lacked sufficient "phrases as to paternity" to have preclusive effect, the court of civil appeals noted statements of the parties in the divorce proceedings—that the children "were born of the marriage," and that the children "were born of our marriage"—as well as provisions in the judgment dealing with child custody and visitation. *Id.* at 1372–73.

*Titus v. Rayne,* 1992 WL 437586 (Del.Fam. Ct.1992), is to the same effect, but notable for the court's frank exposition of its opinion about the equitable aspects of the wife's actions:

> She intended to get what she could out of Husband at a time when it was to her benefit and she further intended to later discard him at will. She knew that Husband did not know. She now wants him out of Amanda's life forever and is apparently already making plans for Amanda to be adopted by Mr. Rufo. Where does this leave Husband, who has contributed love, support, care and affection for Amanda over a long period of time? The plain facts are that Wife was told [by her attorney] she could lie and get away with it, so she did.

*Id.* at *9. Less vehement, perhaps, but of the same opinion in a divorce case, was the Supreme Court of Rhode Island in *Pettinato v. Pettinato,* 582 A.2d 909, 912 (R.I.1990):

> We are concerned about the situation ... wherein a mother can tell a man that he is the father of her child, marry him, and live together as a family, and then illegitimize the child during a divorce proceeding by attacking the legal presumption of paternity that she helped bring about.

I am more attuned to the concern expressed by the Supreme Court of Wyoming in *In re Paternity of J.R.W.*, 814 P.2d 1256, 1265 (Wyo.1991):

> Because of the potentially damaging effect that relitigation of a paternity determination might have on innocent children, the doctrines of res judicata and collateral estoppel are rigorously observed in the paternity context.

*Titus, supra,* is also notable for the relative efficiency with which it marshals the case law supporting the majority rule:

> I have already cited *Slagle v. Slagle,* 11 Va.Ct.App., 341 [398] S.E.2d 346 (1990) which also found that the divorce decree itself constituted res judicata. Many other jurisdictions have considered this issue and found in a similar fashion. See, e.g., *Conlon v. Heckler,* 719 F.2d 788 (5th Cir.1983); *De Weese v. Unick,* 102 Cal.App.3d 100, 162 Cal.Rptr. 259 (1980); *McNeece v. McNeece,* 39 Colo.App. 160, 562 P.2d 767 (1977); *In re Marriage of Yakubec,* 154 Ill.App.3d 540 [107 Ill.Dec. 453, 507 N.E.2d 117], (Iowa Ct.App.1986); *In re Marriage of Zodrow,* [240 Kan. 65,] 727 P.2d 435 (Kan.1986); *Anderson v. Anderson,* 407 Mass. 251, 552 N.E.2d 546 (1990); *Rucinski v. Rucinski,* 172 Mich.App. 20, 431 N.W.2d 241 (1988); *Clay v. Clay,* 397 N.W.2d 571 (Minn.Ct.App.1986), appeal dismissed, 484 U.S. 804, 108 S.Ct. 49, 98 L.Ed.2d 14 (1987); *Butler v. Brownlee,* 152 Mont. 453, 451 P.2d 836 (1969); *Arnold v. Arnold,* 207 Okla. 352, 249 P.2d 734 (1952); *In re Adoption of Young,* 469 Pa. 141, 364 A.2d 1307 (1986); *Chrzanowski v. Chrzanowski,* 325 Pa.Super. 298, 472 A.2d 1128 (1984); *Luedtke v. Koopsma,* 303 N.W.2d 112 (S.D.1981); *Lerman v. Lerman,* 148 Vt. 629, 528 A.2d 1121 (1987); *N.C. v. W.R.C.,* 173 W.Va. 434, 317 S.E.2d 793 (1984).

*Titus,* 1992 WL 437586 at *12. *See also In re Presse,* 554 So.2d 406 (Ala.1989)(extensive discussion of the historical development of the majority rule).

In ignoring the ample example *contra* Mother's position, the majority seems most impressed by the "express and unequivocal mandate" of HRS chapter 584 requiring the parties to submit to genetic testing. However, as my discussion of the purpose of the chapter indicates, the mandate has no legitimate purpose and therefore no mandatory application where, as here, paternity and related rights and protections have already been adjudicated. The Wyoming Supreme Court has reached the same conclusion:

> Appellant's argument fails, however, since it ignores the clear policy implications underlying the [Wyoming Parentage] Act. While genetic testing, appointment of a guardian ad litem and an informal hearing are mandatory in the case of an initial, contested paternity determination, the Act does not mandate that the same procedures be used when paternity has already been established with the consent of the parties in a prior adjudication. We read nothing in the Parentage Act which requires full procedural compliance with the Act before the question of paternity is resolved. Where, as here, appellant and the mother agreed that the children were born of the marriage and this agreement was reflected in the divorce decree, there has been no violation of the mandatory language in the Act. The Act, as applied to the circumstances in this case, made appellant the "presumed father" and, as such, a blood test was not mandatory to establish parentage at the time of divorce. Under W.S. 14–2–106(a) in effect at the time of the divorce, appellant failed to exercise the statutory option of challenging his "presumed father" status in a parentage action joined with the divorce proceeding.

*JRW,* 814 P.2d at 1261 (footnote omitted).

The majority also relies upon its conclusion that, in the battle of the presumptions of paternity defined in the chapter, the genetic-testing presumption championed by Mother wins. As the great weight of authority provides, however, we are in this case no longer speaking of presumptions, but of a final adjudication of paternity which is *res judicata.*

The same reasoning applies to the majority's contention that, pursuant to HRS § 584–6(c), the chapter does not recognize the MSCCA between Mother and Presumed Father. We are no longer talking about a mere agreement between the parties to the divorce. Given the divorce court's approval of the MSCCA and its incorporation into the final divorce decree, we are now speaking of a decree of a court jurisdictionally and in all other respects competent to enter a final adjudication of paternity with preclusive effect. HRS § 571–47.

Finally, the majority generates some heat in arguing that Mother did not suffer claim or issue preclusion by virtue of her participation in the divorce action because the issue of Son's paternity was not affirmatively disputed or litigated in the proceedings. The facts and holding in *Blackshear* and the great weight of other cases catalogued above render this argument simply untenable. Pursuant to such authority, Mother's admissions and actions in the divorce collaterally estop her from relitigating Son's paternity here. Moreover, the determination of Son's paternity in the divorce decree is *res judicata* and bars Mother's petition.

Once it is decided that Mother is collaterally estopped and her petition barred, it remains necessary to deal with Mother's contention that because Son was made a party to the action, his support (through his guardian ad litem) for testing and a paternity determination should be respected, the fate of Mother's requests notwithstanding.

It is true that a weight of example similar to that which bars Mother's petition holds that there is no such bar to an action by Son:

> However, it has been held or recognized, in virtually every case considering the question, that a finding or implication of a child's paternity resulting from an earlier divorce or annulment proceeding is not binding on the child in any subsequent action unless the child was a party to the prior proceeding.

Zupanec, *supra*, 78 A.L.R.3d at 851 (footnote omitted).

In this case, however, Son did not bring the paternity action. He was made a party to the action upon motion by Mother and his support for testing and a paternity determination come solely through the guardian ad litem appointed to represent his interests. His participation and position in this litigation being wholly derivative of Mother's petition, and Mother's petition being estopped and barred, it follows that Son's putative interest in the litigation is no impediment to dismissing Mother's petition.

If mere logic be insufficient in dealing with Son's involvement in the action, the same reference resorted to in favor of Son's putative interest may be levied against it:

> Generally, a finding or implication of paternity has been ruled conclusive in these cases on the ground that parties to a proceeding, *and their privies*, are bound by an adjudication of an issue rendered in a prior action, but also, in the absence of an adjudication, on the ground that a presumption of a child's legitimacy is conclusive.

Zupanec, *supra*, 78 A.L.R.3d at 851 (emphasis supplied). The privity exception to the general rule has been applied as follows:

> Appellants also seek to have Natalie added as a co-plaintiff in this action. This motion appears to be nothing more than a thinly disguised attempt to bolster appellants' case by using the child as a party. If Natalie were placed in such a position by appellants, she would share their interests and therefore would be in privity with them. Natalie's action would then be collaterally estopped by the previous divorce decree. As stated above, collateral estoppel bars relitigation of the same issues by those in privity with the original parties as well as by the original parties themselves.

*Markert*, 394 N.W.2d at 242 (citation omitted).

It may appear impractical to urge that the petition be dismissed, because in that event Mother may simply turn around and bring another petition in Son's name. But I do not believe such a change in petitioner would be merely a distinction without a difference. As in *Markert, supra*, Son's position in this litigation is infected by his Mother's motives and interests. It is quite a different litigation where Son is the original petitioner, and the guardian ad litem appointed to represent his interests in that event should recognize the critical differences.

For all of the foregoing reasons, I would affirm the July 29, 1998 order of the trial court denying Mother's request for genetic testing. Because Mother's petition was barred *ab initio*, I would vacate the November 25, 1998 judgment insofar as it purported to determine Alleged Father's paternity of Son. Because Alleged Father opposes Mother's petition, his right to proceed under HRS chapter 584 is not an issue in this case and I express no opinion on that subject. I would remand the case to the trial court for dismissal of Mother's petition on the grounds

that she is collaterally estopped and barred from bringing her petition.

I therefore respectfully dissent.